# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Case Nos. 07-2308/2573/3162

_____

Sentis Group,  Inc.; Coral Group, Inc.,     *
    *
      Plaintiffs - Appellants,    *
    *
    *    Appeal from the United States
       v.    *    District Court for the Western
    *    District of Missouri.
Shell Oil Company;  Equilon    *
Enterprises, LLC,  doing business    *
as Shell Oil Products US,    *
    *
      Defendants - Appellees.    *

_____

Submitted: February 13, 2008
Filed: March 24, 2009

_____

Before MELLOY, GRUENDER, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

The district court dismissed Plaintiffs' claims with prejudice as a sanction for discovery abuses and other abuses of the judicial process.  The district court relied, in part, on Rule 37 of the Federal Rules of Civil Procedure and on a finding that Plaintiffs had willfully and prejudicially violated several discovery orders.  The district court also cited its own inherent authority to police the conduct of the parties before the court and identified numerous instances of behavior that it deemed abusive but that were unrelated to the court's discovery orders.  After the district court announced its intention to dismiss Plaintiffs' case with prejudice, but before it entered

a written dismissal order, Plaintiffs filed a motion asking the district court to recuse itself. The district court denied that motion. Plaintiffs appeal as to the sanction and the recusal issues. We reverse as to the recusal issue, vacate the order of dismissal, and remand for reassignment and reconsideration of the motion for sanctions.

I. Background

The parties in this case provoked the district court into making untempered comments, using profane language, and taking actions that created an appearance of partiality. Reversal is warranted because the sanction of dismissal rested upon the cumulative findings of several alleged abuses, one of which was clearly erroneous, and several of which involved the court's resolution of close questions. We do not believe any of the alleged abuses, standing alone, necessarily justified the sanction of dismissal. Further, given the severity of the sanction, we do not believe it is appropriate to apply a harmless-error analysis after removing from consideration one or more of the several bases offered as cumulative support for the sanction. Finally, given the appearance of partiality, it is necessary on remand to revisit the close questions that drove the sanctions decision.

Having reviewed this matter thoroughly, we are neither unsympathetic toward the district court nor blind to the course of conduct that triggered the court's frustration. We emphasize that our decision rests on the appearance of partiality, not a finding of partiality. We make no comment as to the range of possible remedies available on remand other than to note that neither party behaved in a manner consistent with the spirit of cooperation, openness, and candor owed to fellow litigants and the court and called for in modern discovery. We do not intend to suggest through this opinion that we condone Plaintiffs' behavior or tactics. Also, it seems clear that at some point in the proceedings, Defendants' goal shifted from conducting effective discovery to fanning the flames of the court's frustration and building a case for sanctions. As such, we encourage the court on remand to carefully consider the

actions of all parties, paying particular attention to the question of prejudice in determining what, if any, sanction is appropriate.

a. General Background

Plaintiffs are two corporations engaged in the business of operating Shell-brand gasoline stations and convenience stores under contracts with Defendants. The parties refer to the contracts as Multi-Site Operator Agreements (the "Agreements"). The Agreements impose an obligation on Defendants to make expense payments to Plaintiffs to reimburse Plaintiffs for certain costs of maintaining retail gasoline operations. Plaintiffs' underlying allegations, broadly drawn, are that Defendants induced Plaintiffs to enter into the Agreements and calculated subsequent payments employing misrepresentations and fraud. Specifically, Plaintiffs allege that Defendants induced them to enter into the Agreements by providing false historic expense and profit figures and that Defendants calculated the expense payments using a method different from what they had represented at the time of contracting. Plaintiffs assert state-law claims including claims of fraud and breach of contract and a federal claim under the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-41. Plaintiffs seek over $28 million in damages.

Discovery in this matter was protracted and contentious. Defendants sought financial information from Plaintiffs as relevant to the underlying question of liability and as relevant to the scope and cause of Plaintiffs' alleged damages. We address in detail the discovery disputes and the parties' actions throughout discovery and leading up to dismissal of this case. For clarity, however, it first is necessary to introduce and explain the roles of the people involved in the case.

b.  Key Personnel

Alan Barazi is Plaintiffs' owner and principal officer.  He communicated with Defendants' employees or officers by various methods, including via email, when the parties were negotiating the Agreements.  In addition, before this litigation commenced, he taped three conversations between himself and Defendants' officers.  His emails and the secretly recorded tapes are at the center of two of five issues that led to dismissal of the case.

Chris Walls is a business consultant Plaintiffs characterize as a member of management.  Plaintiffs designated Walls as an expert on the topic of the Agreements and site operations.  Prior to this litigation, Walls assisted Plaintiffs in negotiating and evaluating the merits of the Agreements, and he subsequently assisted in the management and operation of the stations and in the ongoing analysis of financial performance at the stations.  Although Plaintiffs now characterize Walls as an employee and insist he is a non-retained expert, Walls submitted bills to Plaintiffs on an hourly basis for his work on letterhead from his own consulting firm, TQM Consulting.  At the start of litigation, Walls's resume listed TQM as his employer, but he changed that designation in the course of litigation and eventually listed Plaintiffs as his employers.

Defendants assert Plaintiffs continually shifted their characterization of Walls's status back and forth between that of consultant and/or employee.  Defendants assert it was Plaintiffs' goal to protect certain information Plaintiffs had shared with Walls as privileged while at the same time characterizing Walls as an outside consultant so that he could view information Defendants argue was subject to a protective order.  Production related to Walls appears to have been the primary issue that frustrated the court and led to dismissal of the case.  Four of the five discovery orders involved production related to Walls.

Nick Anton is an accountant who served as Plaintiffs' employee at the time Plaintiffs entered into the Agreements. Plaintiffs assert that Anton's employment ceased in late 2004 or early 2005 and that he has served as an outside accounting consultant since that time. Defendants point out, however, that Barazi and Anton signed state liquor-license applications after 2005 and that the state liquor-license applications name Anton as a manager, managing officer, or managing agent.

Defendants argue that Plaintiffs and Barazi lied to the court and to Defendants about Anton's status in order to prevent Defendants from gaining access to information held by Anton. Two of the five issues that led to the sanction of dismissal involved Anton. One was related to purported misrepresentations about Anton's status and Plaintiffs' failure to comply with an order to make Anton appear at a court hearing. The other was related to a triple-hearsay report of an alleged attempt to pay Anton to withhold information.

c. Perceived Abuses that Served as the Basis for Dismissal

i. Documents and Discovery Orders Related to Chris Walls

Plaintiffs filed the present action in July 2005. In their Rule 26(a)(1) disclosures, they designated Walls as a person with knowledge of their claims. In early 2006, Plaintiffs produced a privilege log to Defendants referring to fifty-eight purportedly privileged documents Walls reviewed and/or generated. Defendants subpoenaed Walls, and in April 2006, Plaintiffs objected, claiming Walls was Plaintiffs' employee and expert. Plaintiffs then failed to produce Walls for a fact deposition. Defendants moved to compel separate depositions of Walls as a fact witness and as an expert witness, and the district court granted the motion. Notwithstanding the district court's grant of this motion, Defendants failed to exercise their authority to take an expert-witness deposition of Walls.

Walls's fact-witness deposition took place in May 2006. In the deposition, Walls stated that all services he provided to Plaintiffs were through his own consulting firm, TQM; TQM billed Plaintiffs for Wall's services on TQM letterhead; and TQM received $300 per hour from Plaintiffs for Walls' services. Walls never received a W2 form from Plaintiffs. Nevertheless, Walls stated that he considered himself Plaintiffs' employee. Defendants agree that, since 2005, Walls has spent "98 percent of his time assisting Plaintiffs with their claims that the MSO Model was flawed and that Shell was not properly calculating rent and expense payments." Counsel for Defendants, in fact, characterize Walls as "an important fact witness in this case, and he's a management member of the plaintiff organization who probably is appearing to be one of the central figures."

In the course of the fact-witness deposition, Walls referred to one specific document that he created and used in a presentation to Plaintiffs' former counsel. The document was an attempt by Walls to describe Plaintiffs' claims and arguments for the purpose of litigation. Defendants subsequently demanded production of this one document. Plaintiffs refused, and Defendants sought an order from the district court directing Plaintiffs to disclose this one document. The district court entered a first discovery order on June 16, 2006, that stated, as relevant for the purpose of this appeal, "For each of Plaintiffs' experts, Plaintiffs are ordered to produce the information considered by and/or relied upon in forming that expert's opinion." Plaintiffs continued to refuse to disclose the document, claiming that it was a document generated by Walls rather than a document considered or relied upon by Walls in forming his opinion.

Defendants again sought an order from the district court, and on July 13, 2006, the court entered a second discovery order that stated, "Plaintiffs are ordered to produce any reports or analysis produced [created] by Chris Walls from February 5, 2005, as referred to by Chris Walls in his deposition." Plaintiffs continued to refuse to give the document to Defendants because, according to Plaintiffs, Walls had created

the document at issue prior to February 5, 2005. In addition, Plaintiffs asserted the document was protected by attorney–client privilege, and they claimed the district court had not addressed Plaintiffs' claims of privilege. Defendants do not seriously dispute this assertion as they admit the district court, at most, had only implicitly ruled against privilege prior to August 2006.

Defendants again sought an order from the district court, and on August 17, 2006, the court entered a third discovery order, stating, "Plaintiffs are ordered to produce the document created by Mr. Walls currently being withheld on grounds of privilege. This Court finds that any privilege was destroyed due to Mr. Walls' reliance on said document." Plaintiffs claim that in late August 2006, they produced the one document described in the third discovery order. Defendants claim Plaintiffs did not produce the document, but rather, produced a different document.

Defendants subsequently asked Plaintiffs for all fifty-eight documents from the privilege log. Plaintiffs refused, and on September 7, 2006, Defendants emailed a letter to the court asking the court to order Plaintiffs to produce all fifty-eight of the documents. The following day, the court issued an order that stated, in part:

> Plaintiffs are ordered to produce any and all document or analysis developed by Chris Walls relating to this litigation, regardless of whether the document is claimed as privileged or if Chris Walls relied upon said document. The documents must be produced by noon on Monday September 11, 2007 [sic]. If this documents are not produced, Plaintiffs will not be permitted to present the testimony of Mr. Walls at trial.

On its face, this fourth discovery order was broader in scope than the preceding orders. On September 11, Plaintiffs petitioned our court for a Writ of Mandamus seeking to avoid production under a claim of privilege. In a responsive filing, Defendants clarified that they sought merely "data or other information considered by Chris Walls in forming his opinions." We denied the petition on September 26, 2006.

-7-

Shortly thereafter, Plaintiffs produced to the district court for in camera review documents they considered to be privileged documents related to Chris Walls without limitation to whether the documents were related to Walls's expert opinion. They also produced a different, more limited body of documents directly to Defendants.

Plaintiffs filed a motion for in camera review, and Defendants filed a motion for sanctions. Defendants alleged in their motion that the documents Plaintiffs produced directly to Defendants did not contain the fifty-eight documents from the March 2006 privilege log and that the documents contained Bates labels different from those referenced on the March 2006 privilege log.

The court did not rule on the motion for in camera review. Rather, it scheduled a hearing for December 15, 2006, to address the motion for in camera review and the issue of sanctions. We discuss the December 15, 2006 hearing below. After the hearing, but before the court entered its written order of dismissal, Plaintiffs provided a table that cross-referenced the new and old Bates labels.[1]

### ii. Nick Anton

A second discovery issue the court addressed at the sanctions hearing and in the court's order of dismissal involved the production of accounting information by Nick Anton and Plaintiffs' characterization of Anton as an outside consultant.

---

[1]This is one area where we are very sympathetic to the district court. It was extremely confusing and frustrating to the court to have Plaintiffs change Bates-label numbers on documents mid-litigation. Whether this was done in a deliberate attempt to sow further confusion or for more benign purposes will be left to the district court on remand.

Plaintiffs assert that Anton was their employee when Plaintiffs began operations under the Agreements and remained an employee through late 2004 or early 2005. Plaintiffs assert, however, that Anton has been working for Plaintiffs as an outside consultant since early 2005. It appears that Plaintiffs have been consistent in this characterization of Anton's status to Defendants and to the district court. Barazi and Anton, however, submitted multiple liquor-license applications in Missouri during the pendency of this litigation, and they represented on the applications that Anton was Plaintiffs' manager, managing agent, or officer.

Defendants sought financial reports and tax returns held by Anton during Plaintiffs' initial production of documents. By mid 2006, it was not clear that Defendants had received all of the accounting information they requested. In particular, Defendants had not received a "payroll journal" they believed to be important to their case. Further, Defendants had received some information as raw data that was meaningless unless opened with the same computer program used by Plaintiffs. Defendants deposed Anton in May 2006, and at that time, Anton claimed that he did not maintain a "payroll journal." Defendants then asked the court for assistance.

On June 30, 2006, the court ordered Anton, Barazi, and one of Plaintiffs' employees to appear in court on July 6, 2006, for an evidentiary hearing. Barazi and the employee appeared, but Anton did not.[2] Plaintiffs' counsel represented to the court that Anton was on vacation over the Fourth of July and could not be reached despite Plaintiffs' repeated attempts. In response to this assertion, the district court stated, "[a]ll right, that's fine." At that hearing, Plaintiffs' attorney represented to the

---

[2]The district court and dissent rely upon the failure of Anton to appear at the July 6 hearing as support for the dismissal. However, neither the district court nor the dissent discuss the assertion by counsel (apparently accepted by the district court at the time of the hearing) that counsel was unable to contact Anton during the short time frame between June 30 and July 6.

-9-

court that Anton was an outside consultant and not an employee. Although Barazi was present, he did not testify as to Anton's status.

In mid-August, the court ordered that Plaintiffs make Anton and his computer available for another deposition. Defendants deposed Anton a second time on September 13, 2006, and Anton complied with the order, bringing his computer to the deposition. After asking a few questions, Defendants discovered that Anton's computer did, in fact, contain a file named "payroll journal." Defendants terminated the deposition, reserving the right to question Anton further in the future, if deemed necessary.

### iii. Alleged Attempt to Pay Anton to Conceal Documents

A third issue cited by the district court in its order of dismissal was a hearsay report of an alleged attempt by someone to bribe Anton to conceal information.

One of Defendants' attorneys, Ms. Badger, submitted a written affidavit to the district court in which she stated that she had received a phone call from a person she did not know who claimed to be an attorney from Houston and personal counsel for Anton. According to Ms. Badger, the person who represented himself as Anton's personal counsel from Houston alleged that Plaintiffs had offered to pay Anton to conceal data favorable to Defendants. Ms. Badger asserted that the man on the phone sought compensation from her for documents in Anton's possession. The affidavit did not allege that the man on the phone identified specifically who had made an offer to Anton.

The district court expressly found in its order of dismissal that Defendants' attorney, Ms. Badger, was credible "due to [her] almost twenty-years of respected practice in front of this Court." The district court relied on the affidavit and the

credibility assessment of Ms. Badger in finding that Plaintiffs had abused the discovery process.

### iv.  Production of Surreptitiously Taped Conversations

A fourth issue cited by the court in its order of dismissal involved tape recordings Barazi made of three conversations with Defendants' employees.

In their initial production of discovery materials, Plaintiffs provided recordings Barazi had made of two pre-litigation conversations between Barazi and Defendants' officers.  Defendants deposed Barazi on August 17, 2006, at which time Defendants asked Barazi about recorded conversations.  Barazi answered in the affirmative when asked if he had recorded "a conversation" with one of Defendants' officers and if he had recorded "conversations" with a second officer.  In November 2006, Plaintiffs attached a tape of the third conversation to a motion.

In support of their motion for sanctions, Defendants asserted that Barazi lied by testifying in his deposition that he had recorded only two conversations with Defendants.

### v.  Production of Emails

A fifth issue the district court cited as a basis for its dismissal order involved a particular email and attached document that Barazi sent to one of Defendants' employees.  During discovery, it became apparent that the parties were disputing when and whether Plaintiffs or Defendants had inserted certain language or numbers in the draft Agreement.  The email and attachment were relevant to answering this question.  Defendants claimed that they possessed multiple copies of the emailed document containing subsequent edits and changes but that their employee had not retained a copy of the original document as sent from Barazi.  Similarly, Plaintiffs

claimed to possess multiple subsequent copies, but no copy of the original document as sent to Defendants' employee.

Defendants sought the original email from Barazi in discovery. Barazi claimed to have sent the email from a public computer using a Yahoo! account that did not retain files long enough to cover the dates in question. Barazi could not remember the exact location of the public computer. Counsel for Plaintiffs indicated Barazi may have sent the email from an unidentified internet café in Chicago, but Barazi failed to confirm this assertion. Defendants urged the court to disbelieve Barazi.

d. The Order of Dismissal and Denial of the Motion to Recuse

At the December 15, 2006 hearing, Plaintiffs made a presentation as to the motion for in camera review. Defendants then made an hour-long PowerPoint presentation addressing the discovery orders related to Walls, the alleged abuses surrounding the email and tape production, Nick Anton, and the alleged attempt to pay Anton to conceal documents. In Defendants' presentation, Defendants repeatedly referred to the district court's four discovery orders involving Walls as though they were identical in scope and had all called for the production of a body of documents labeled "the Walls documents." At the end of Defendant's presentation, the following exchange took place:

THE COURT: Well, I want to know something right up front: Have you produced the 58 documents that were the original request that's generated the trip to the Eighth Circuit, have you produced them?

MR. STARRETT [Plaintiffs' counsel]: To them?

THE COURT: Well, hell, yes. Why would you ask a question like that? Hell, yes, to the defendant.

MR. STARRETT: The answer – excuse me, Your Honor. I'm sorry.

-12-

THE COURT: Yes. Did you? Have you?

MR. STARRETT: Those have not all been produced to them because they are not all expert documents. There are other documents –

THE COURT: You didn't hear enough with four phone conferences, and I'm sorry you missed one, with three, four, I kept telling you to produce stuff, expert stuff. You ducked. You wove. You did everything to keep from producing them. You go to the Eighth Circuit. They tell you to produce them, and you still goddamn don't produce them. Now what the hell do you not understand? You must produce them. Jesus Christ, I don't want any more ducking and weaving from you on those 58 documents. That's unbelievable. That gives credence to everything I just heard from the defense. Now, tell me why else you don't think that I ought to dismiss this case because of Mr. Walls ducking and weaving, and Anton, at the direction of Mr. Barazi. You better tell me. I'm about ready to throw this thing out. When you tell me that you still haven't produced those goddamn 58 documents after four times, four times I've ordered you to produce them. You are abusing this Court in a bad way. Now tell me.

MR. STARRETT: Well, may I start with the fact –

THE COURT: Yes.

MR. STARRETT: – that you have not ruled four times to give them those 58 documents –

THE COURT: That's it. I'm done. I'm granting the defendant's motion to dismiss this case for systematic abuse of the discovery process. Mr. Harris, I direct you to prepare a proposed order with everything you've just put on that presentation. I'll refine it and slick it up. Mr. Barazi has abused this court, has misled you, has lied on his deposition. It's obvious he's lying about that e-mail. This case is gone. I'm dismissing it. What a disgrace to the legal system in the Western District of Missouri. Prepare the proposed order. We're done. We are done, done, done. What a disgrace. It's not your fault, it's your client. He's

-13-

coached, he's ducked, and he's hid documents. We're done. Be in recess.

Shortly after the hearing, Defendants tendered a proposed order, and Plaintiffs filed suggestions in opposition to the proposed order. On June 1, 2007, Plaintiffs filed a motion to recuse, and on June 4, 2007, in apparent anticipation of a 150-day deadline as set forth in Federal Rule of Civil Procedure 58(c)(2)(B), Plaintiffs filed a notice of appeal. On June 14, 2007, the district court entered its written order of dismissal with prejudice and the clerk entered judgment. On June 29, Plaintiffs again filed a notice of appeal, and on August 17, 2007, the district court entered an order denying Plaintiffs' motion for recusal. Plaintiffs filed a timely notice of appeal following the district court's entry of that order.

Currently pending before the district court is a motion by Defendants claiming over $2 million in attorney fees and costs. The district court has suspended action on that motion pending our resolution of these combined appeals. Currently pending in our court are the appeals from the district court's June 14 and August 17 orders.

In its June 14 order of dismissal, the district court recited several of Plaintiffs representations regarding Walls's status and chronicled the discovery orders and Plaintiffs' responses to those orders. In particular, the district court found that Plaintiffs had represented to the court in a May 9, 2006 filing that Walls was a retained expert and had relied on retained-expert provisions of a protective order to secure Walls's access to Defendants' protected materials. The court also found that Plaintiffs subsequently characterized Walls as an employee, claiming certain materials were subject to attorney–client privilege. Ultimately, the district court concluded that Plaintiffs had lied to the court regarding Walls's status. The court also stated, "This Court issued four orders compelling the production of the Chris Walls documents. Plaintiffs have failed to produce all fifty-eight Chris Walls documents." The court proceeded to note that the documents Plaintiffs produced to Defendants following our

-14-

denial of mandamus relief were not the same as the fifty-eight documents on the privilege log.

Regarding the tapes, the court found that Barazi had lied by claiming to have taped only two conversations with Shell officers. Regarding the emails, the court noted that, "Plaintiffs have never produced a critical email and attachment in this litigation, which is an August 7, 2003 email . . . ." Regarding Nick Anton, the district court found that Anton's absence from the July 6, 2006 hearing was a violation of a discovery order notwithstanding its earlier, apparent lack of concern with Anton's absence. The district court also relied upon the purported offer to pay Anton to withhold documents as evidence of Plaintiffs' willfulness and bad faith. The court stated:

> Plaintiffs also violated the Court's June 20, 3006 Order requiring the production of Nick Anton at the July 6, 2006 hearing. Mr. Barazi sat in the courtroom passively listening while his counsel misrepresented Mr. Anton's employment status and their ability to produce Mr. Anton to this Court.

> The evidence as to Mr. Barazi's offer to pay Mr. Anton to withhold "unfavorable" documents from discovery leads the Court to believe that the above violations are just the "tip of the iceberg" Chrysler, 186 F.3d at 1020-1022. Plaintiffs clearly made every effort to avoid compliance with the orders of this Court and the rules of discovery.

II.     Discussion

a.  Dismissal Sanction

"We review the district court's imposition of discovery sanctions for abuse of discretion." Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec., 380 F.3d 1084, 1105 (8th Cir. 2004). "We note, however, that the district court's

-15-

discretion narrows as the severity of the sanction or remedy it elects increases." Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008).  The sanction of dismissal is among the harshest of sanctions, and "[t]here is a strong policy favoring a trial on the merits and against depriving a party of his day in court."  Fox v. Studebaker-Worthington, Inc., 516 F.2d 989, 995–96 (8th Cir. 1975).  Accordingly, "[a]lthough we review the district court's discovery decisions for an abuse of discretion, we more closely scrutinize dismissal imposed as a discovery sanction because 'the opportunity to be heard is a litigant's most precious right and should sparingly be denied.'" Schoffstall v. Henderson, 223 F.3d 818, 823 (8th Cir. 2000) (quoting Chrysler Corp. v. Carey, 186 F.3d 1016, 1020 (8th Cir. 1999)).  To the extent a discovery sanction depends upon an interpretation of law, our review of the underlying legal determination is de novo.  United States v. Gonzalez-Lopez, 403 F.3d 558, 564 (8th Cir 2005) ("[A] district court by definition abuses its discretion when it makes an error of law." (internal quotation and citation omitted)).

When a dismissal sanction rests upon purported violations of discovery orders, courts should ensure that the specific requirements of Federal Rule of Civil Procedure 37 are met.  Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers, 357 U.S. 197, 207 (1958) (reversing a sanction of dismissal for failure to satisfy the requirements of Rule 37).  To justify a sanction of dismissal, Rule 37 requires: "(1) an order compelling discovery, (2) a willful violation of that order, and (3) prejudice to the other party."  Schoffstall, 223 F.3d at 823.  Further, as per Societe Internationale, a Rule 37 analysis normally should stand alone and not blend together with a less-structured, inherent-authority analysis.  There, the Court stated:

> In our opinion, *whether a court has power to dismiss a complaint because of noncompliance with a production order depends exclusively upon Rule 37*, which addresses itself with particularity to the consequences of a failure to make discovery by listing a variety of remedies which a court may employ as well as by authorizing any order which is 'just.' There is no need to resort to Rule 41(b), which appears

in that part of the Rules concerned with trials and which lacks such specific references to discovery. Further, that Rule is on its face appropriate only as a defendant's remedy, while Rule 37 provides more expansive coverage by comprehending disobedience of production orders by any party. *Reliance* upon Rule 41, which cannot easily be interpreted to afford a court more expansive powers than does Rule 37, or *upon 'inherent power,' can only obscure analysis of the problem before us.*

Societe Internationale, 357 U.S. at 207 (emphasis added).

Our court has not treated this guidance from Societe Internationale as creating an absolute rule demanding strict segregation of inherent authority and Rule 37 analyses. Rather, we have affirmed the imposition of a sanction of dismissal in a case where a district court blended a Rule 37 analysis with an inherent-authority analysis. See Chrysler, 186 F.3d at 1019 ("The district court imposed the sanction under Rule 37 of the Federal Rules of Civil Procedure and the inherent authority of the court."). Nevertheless, the guidance from the Court is clear, and we emphasize that the better practice is to apply Rule 37 where appropriate and not allow an exercise of inherent power to "obscure" the Rule 37 analysis. Societe Internationale, 357 U.S. at 207.

That is not to say that inherent powers are insufficient to justify the sanction of dismissal in an appropriate case if a court makes an express finding of bad faith. See Chambers v. Nasco, 501 U.S. 32, 49 n.14 (1991) (stating that Societe Interna-tionale would not preclude a sanction of dismissal via a court's inherent power and noting that the Court had held only that where Rule 37 was applied "there was 'no need' to resort to . . . inherent power." (quoting Societe Internationale, 357 U.S. at 207)). Rather, inherent authority is a broad and powerful tool. As such, it should be used sparingly. Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980) ("Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion."). In general, then, courts first should turn to specific rules tailored for the situation at hand, such as Rule 37, to justify sanctions. Then, as

an alternative basis for support or in circumstances where specific rules are insufficient, *i.e.*, when "there [is] a need," it may be appropriate to invoke their inherent authority. Societe Internationale, 357 U.S. at 207; see also Chambers, 501 U.S. at 49 and 49 n.14 ("[P]rior cases have indicated that the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct," but "because individual rules address specific problems, in many instances it might be improper to invoke one when another directly applies.").

It follows from this general rule that the best practice is to keep the structured analysis for a particular rule separate from the relatively unstructured analysis associated with inherent authority. In the present case, the district court based its dismissal, in part, on its determination that Plaintiffs had violated five discovery orders: four by failing to produce what it referred to in its order of dismissal as "the Walls documents," and one by failing to make Anton appear at the July 2006 hearing. The district court also referred to its inherent authority and cited the email production, the recorded-conversation production, Barazi's purported lies, and the purported attempt to bribe Anton as additional grounds in support of the dismissal sanction. These latter issues may provide insight as to willfulness or bad faith, but they were unrelated to any discovery orders, and as such, appear to support sanctions primarily under the court's inherent authority. As per Societe Internationale, reliance upon such authority seems to have "obscure[d] analysis of the problem." 354 U.S. at 207.

Looking first at these non-discovery-order-related issues, we conclude that no weight can be accorded to the alleged attempt to bribe Anton because there was no reliable evidence to support the allegation. See Brooks v. Tri-Systems, Inc., 425 F.3d 1109, 1111–12 (8th Cir. 2005) (holding in the context of a dispositive motion that an affidavit containing out-of-court statements offered for the truth of the matter asserted may not be used to support or defeat a motion for final disposition of a case). Here, the district court excused the hearsay nature of the affidavit based upon personal knowledge of Ms. Badger's reputation for truthfulness. Her reputation for

truthfulness, however, only partially addresses one of the many layers of hearsay embedded in her affidavit. Even assuming the phone call occurred and was reported accurately by Ms. Badger, there are no indicia of reliability to support the truthfulness or accuracy of the purported facts that: the man on the phone was who he claimed to be; the man on the phone served as Anton's private counsel; the man on the phone had spoken to Anton about an alleged offer; some person had offered Anton money to conceal documents; or the person who allegedly made an offer to Anton was a principal or agent of Plaintiffs.

While the Federal Rules of Evidence do not necessarily apply in the context of a motion for sanctions, evidence relied upon must, at a minimum, bear indicia of reliability. See, e.g., Jensen v. Phillips Screw Co., 546 F.3d 59, 66 n.5 (1st Cir. 2008). This is especially true when the sanction imposed is the draconian sanction of dismissal with prejudice. Just as an affidavit containing hearsay and not otherwise bearing indicia of reliability cannot support the final disposition of a case on summary judgment, the present affidavit cannot support the present dismissal. See Brooks, 425 F.3d at 1112.

Ms. Badger's allegations are troubling to say the least, and our conclusion that her affidavit was incapable of supporting the district court's judgment of dismissal does not detract from the seriousness of her allegations. If Plaintiffs or their agents actually offered to pay Anton to conceal evidence, the outcome of the sanctions question becomes clear. In fact, it may become necessary to refer this matter for possible prosecution. Allegations standing alone, however, cannot justify dismissal, and it was error to rely upon the allegations in the infirm affidavit without an investigation or an evidentiary hearing.

Because we must "closely scrutinize" the severe sanction of dismissal, and because the present sanction rested on a hybrid analysis under Rule 37 and the court's inherent authority, Schoffstall, 223 F.3d at 823, we cannot affirm the sanction once

we have eliminated this substantial basis for support. Whether deemed relevant to the question of willfulness regarding a Rule 37 sanction for willful violation of a discovery order or to the question of bad faith for purposes of a sanction based on the court's inherent authority, the court clearly based its dismissal, at least in part, on the alleged offer to pay Anton.

We write further as to the dismissal issue because the other stated grounds for dismissal involved resolution of close questions and interpretations of the record that demand reexamination given our determination, as set forth below, that recusal is merited. To the extent the court on remand might again view a pattern of conduct as evidence of willfulness (as relevant to a possible Rule 37 violation) or, in the alternative, as evidence of bad faith (as relevant to a possible inherent-authority analysis), the court will need to address these issues anew.

Regarding the email, it is undisputed that both parties had multiple copies of the email and the attachment, but both parties claimed not to possess an original, unamended version. The district court stated, "it was obvious that Barazi was lying." Barazi's purported lie regarding the email, however, amounted to nothing more than his inability to recall the precise location from which he had sent an email three years earlier.[3] To the extent Barazi was not lying, it is not clear why the sender of an email should be held any more accountable than the recipient for failing to produce an original, unamended copy of the email or an attachment three years after it was sent. Ultimately, the questions surrounding the email were close questions that involved credibility assessments of persons who did not testify. In light of our resolution of the recusal issue, the underlying determinations regarding the email issue cannot stand, and we cannot view this issue as offering substantial support for the sanction decision.

---

[3]Defendants played a limited excerpt of Barazi's videotaped deposition testimony during their presentation at the sanctions hearing.

Similarly, reliance on purported misrepresentations about the taped conversations is problematic and should be reviewed on remand. Barazi actually stated in his deposition that he taped at least three conversations: he answered in the affirmative when asked if he had taped a conversation with a certain officer and if he had taped conversations [plural] with another officer. Plaintiffs provided the tape of the third conversation as an attachment to a motion and claimed later that the initial failure to produce this material was an inadvertent error. While the district court was not required to accept this assertion of inadvertent error, it would seem strange for a party purposefully to conceal the existence of a taped conversation and then rely upon and attach that taped conversation to a motion. Further, the court made no reference to the content of, or possible prejudice related to, the tape in question.

In any event, Defendants supported their motion for sanctions with an excerpt of different deposition testimony. In the excerpt that Defendants offered to the court, Defendants' attorney cut-off Barazi's answer after asking him whether he had taped additional conversations:

> Q. Have you tape recorded any other conversations relating to your MSO operations at Shell?
> A. No, I mean.
> Q. And have you videotaped any activities related to Shell, Shell meetings, conversations, conferences.

At most, then, the record may contain inconsistencies regarding Barazi's claims about taped conversations. It is not clear that these inconsistencies resulted from lies. Again, in light of our resolution of the recusal issue, we cannot view the current record regarding the dispute over taped conversations as offering substantial support for the sanction decision.

Regarding the production of documents generated, considered, or relied upon by Walls, Defendants and the district court characterize the four discovery orders as

having called for production of the same documents. They did not. The orders each contained slightly different descriptions of the documents to be produced, and Plaintiffs read each order in a limited fashion to limit production. This behavior was evasive and appears to have been directed toward protecting a claim of privilege. While this behavior may have resulted in technical non-compliance with one or more of the orders, the court's overly broad characterization of the orders demonstrates that the orders were not clear, and it makes the existence of any non-compliance equally unclear. Further, Plaintiffs' apparent gamesmanship, while not admirable, is not necessarily indicative of a willful violation of the orders.

We note also that evasiveness related to the production of these documents may be excusable in this case because Plaintiffs presented a non-frivolous argument regarding privilege, and Defendants admit the district court did not address the privilege argument until the third order. Our court held in In re Bieter, 16 F.3d 929, 939–40 (8th Cir. 1994), that privilege extended to communications between a non-employee contractor or consultant and a party's lawyer. We stated that a person's technical status as an employee or contractor was not necessarily dispositive as to privilege because oftentimes a party may rely upon and use a consultant in a manner essentially equivalent to an employee. See id. at 938 ("There is no principled basis to distinguish [the consultant's] role from that of an employee, and his involvement in the subject of the litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentially in order to understand Bieter's reasons for seeking representation. As we understand the record, he was in all relevant respects the functional equivalent of an employee." (internal citations omitted)). As such, it is not clear that the district court on remand necessarily will find a willful violation rather than a careful attempt at compliance coupled with an attempt to preserve privilege.

Finally, given the differences between the four orders for production of Walls-related documents, we believe there was a lack of clarity in the orders. It is not clear

at this point that Plaintiffs' interpretations of those orders and limited production actually resulted in violations of the orders. Given the severity of the sanction of dismissal, Plaintiffs' substantial production of documents for in camera review merited greater attention or, at a minimum, denial of the motion for in camera review and delivery of the documents from the court to Defendants.

Regarding the related issue of purported misrepresentations as to Walls's and Anton's status, the district court found that Plaintiffs made misrepresentations on several occasions. The court deemed this status relevant to more than the question of privilege. The court deemed perceived misrepresentations about Walls's status to be abuses of the judicial process. An example cited in the written order of dismissal was Plaintiffs' characterization of Walls as a non-employee, retained expert in a May 2006 filing. In that document, however, Plaintiffs did not represent that Walls was a retained expert. Rather, they expressly characterized Walls as an employee, stating, "This motion arises from Shell's unsupported efforts to limit Plaintiffs' expert testimony by refusing to permit Chris Walls, an employee and expert witness of Plaintiffs, to view certain documents including the MSO Model and historic financial information designated by Shell as 'highly confidential.'" Regarding Anton, it is not clear that Plaintiffs ever represented to the court that Anton was anything but an outside consultant after early 2005. The court cited the later-filed Missouri liquor-license applications as evidence that Plaintiffs had lied, but it is not clear that any statements on these Missouri documents are inconsistent with Anton being a non-employee.

Finally, regarding the issue of prejudice, the court stated:

Defendants have suffered prejudice from Plaintiff's conduct. After months of litigation, Defendants, and this Court, have still not had the ability to gain a clear picture of the discovery available and the roles of the parties involved in this case. Defendants ability to conduct discovery

-23-

and counter Plaintiffs' arguments has been destroyed by Plaintiffs' actions in this case.

We agree that Plaintiffs have not been forthcoming with their production, and as noted above, they have been particularly evasive as to documents related to Walls. It appears from the record on appeal, however, that everything that might be produced has been produced to the court or to Defendants. Because the court had ordered Plaintiffs to produce materials to Defendants, Plaintiffs' election to produce the materials for in camera review would seem to be a technical violation of the discovery order. It is difficult, however, to call such a violation willful or to find prejudice where it would have been a simple matter for the court to permit Defendants to view or retrieve the documents.

Regarding the inability to obtain data from Anton, Defendants voluntarily terminated Anton's deposition and chose to pursue sanctions rather than pursue discovery as to the "payroll journal" they deemed critical to their case. In sum, the question of prejudice is, like the other questions presented below, a close question that a new judge need not resolve in the same manner. We emphasize that, on remand, the district court need not find Plaintiffs' actions excusable, non-prejudicial, nor innocuous. We note only that the present record contains several close questions as to Plaintiffs' willfulness, Plaintiffs' violation of one or more discovery orders, the existence of prejudice, and the appropriateness of the overall sanction of dismissal. Given the appearance of partiality and the close scrutiny applicable to the severe sanction of dismissal, these questions demand further examination.

b.  Recusal / Reassignment

In the district court, Plaintiffs moved for recusal citing 28 U.S.C. § 455(a). Plaintiffs appeal the district court's denial of that motion and ask further that we exercise our authority under 28 U.S.C. § 2106 to assign the case to a different judge

on remand. The motion for recusal, filed nearly six months after the December 15 hearing, was untimely. See Tri-State Fin., LLC v. Lovald, 525 F.3d 649, 653–54 (8th Cir. 2008) (holding a recusal motion untimely when brought seven months after the last act alleged as a basis for recusal); Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 566 (8th Cir. 1997) (finding a § 455(a) motion for recusal untimely when filed after a district court granted summary judgment); In re Kan. Pub. Employees Ret. Sys., 85 F.3d 1353, 1360 (8th Cir. 1996) (stating that § 455 requires "timely action" and that "[m]otions to recuse should not be viewed as . . . additional arrow[s] in the quiver of advocates in the face of [anticipated] adverse rulings."). Nevertheless, because we have determined remand is appropriate, we may address the issue of reassignment notwithstanding the untimeliness of the § 455(a) motion. See United States v. Tucker, 78 F.3d 1313, 1323–24 (8th Cir. 1996) (invoking the authority of § 2106 and directing reassignment to a different judge on remand even though the party seeking reassignment had failed to present the issue of recusal to the district court); see also Liteky v. United States, 510 U.S. 540, 554 (1994) ("Federal appellate courts' ability to assign a case to a different judge on remand rests not on the recusal statutes alone, but on the appellate courts' statutory power to 'require such further proceedings to be had as may be just under the circumstances.'" (quoting 28 U.S.C. § 2106)).

We apply the § 455(a) standard in determining whether to order reassignment pursuant to § 2106. Tucker, 78 F.3d at 1324 (equating the § 455(a) appearance of partiality standard with the standard for reassignment under § 2106). In accordance with that standard, recusal or reassignment is appropriate where "impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." In re Kan. Pub. Employees Ret. Sys., 85 F.3d at 1358–59 (applying § 455(a)).

Although, in general, reassignment should rest upon an appearance of bias or prejudice derived from an extrajudicial source, reassignment may be necessary based

solely on events transpiring in current court proceedings or on a court's statements or rulings where "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Liteky, 510 U.S. at 554 (rejecting strict application of the extrajudicial source doctrine). Here, there is no extrajudicial source indicating an appearance of partiality. The proceedings leading up to and including the sanctions hearing, however, and the ultimate order of dismissal, reflect a sufficiently high degree of antagonism to require reassignment of the case on remand.

In the course of numerous in-person and telephone conferences and hearings, the court directed profanities at Plaintiffs or Plaintiffs' counsel over fifteen times. In addition, at the December 15 sanctions hearing, the court denied Plaintiffs a meaningful opportunity to respond following Defendants' lengthy presentation, and in doing so, misconstrued the language of its own discovery orders and dismissed Plaintiffs' attempt to explain those orders. The court adopted Defendants' characterization of the four discovery orders as all having required production of the same "Walls documents." This was the case even though the first three orders had temporal or qualitative limitations on the documents subject to the order, and the third order demanded only the production of one document. When Plaintiffs attempted to explain at the sanction hearing "that you have not ruled four times to give them those 58 documents," the district court cut off Plaintiffs and moved toward dismissal.

In these circumstances, we believe "the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." United States v. Poludniak, 657 F.2d 948, 954 (8th Cir. 1981). This is not merely a case, then, where a court's use of salty language should be overlooked. See Liteky, 510 U.S. at 555–56 (1994) ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display."). Here, the court's statements must be viewed in context alongside the court's adoption of Defendants' mischaracterization of the discovery

orders, its apparent distrust of Plaintiffs as manifested early in the litigation, and its reliance on the Badger affidavit without giving Plaintiffs an opportunity for discovery or a hearing as to its contents.

III. Conclusion

On remand, we encourage the court to consider a range of potential sanctions and to examine each party's actions. Plaintiffs undoubtedly were evasive in discovery, and Defendants appeared to have directed their efforts not toward effective discovery, but toward exaggeration of ancillary issues (such as employment status) and fanning the flames of the district court's discontent. In particular, we believe remand should include but not be limited to: (1) examination of the materials provided to the court for in camera review; (2) a careful analysis of the extent to which Plaintiffs may have failed to comply with discovery orders; and (3) whether any non-compliance was willful or was carefully calculated to preserve asserted privilege while narrowly construing the different orders. To the extent it is alleged Plaintiffs attempted to pay Anton to conceal evidence, the court on remand may need to conduct an evidentiary hearing. Any findings regarding this allegation would likely factor heavily into the sanctions analysis.

We reverse and remand for further proceedings.

GRUENDER, Circuit Judge, dissenting.

Because I do not agree with the Court's conclusions that the district court abused its discretion in dismissing this case and that the case should be reassigned on remand, I respectfully dissent.

Initially, I agree with the Court that the Plaintiffs' motion for recusal was untimely. *See Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 653 (8th Cir.), *cert.*

*denied*, 555 U.S. ---, 129 S. Ct. 630 (2008) ("Motions for recusal under 28 U.S.C. § 455 will not be considered unless timely made. The timeliness doctrine under § 455 requires a party to raise a claim at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." (internal quotations and citation omitted)). In support of their recusal motion, the Plaintiffs cited the district court's language at the December 15, 2006 hearing, along with other acts allegedly reflecting the district court's partiality that took place between February and December 2006. The latest of these events occurred at the December 15 hearing. However, the Plaintiffs did not file their motion to recuse until June 1, 2007, nearly six months after they learned that the district court would dismiss the case based on the Plaintiffs' systematic abuse of the discovery process. The Plaintiffs argue that this prolonged delay demonstrates that they did "not file [the] [m]otion in haste or without careful consideration." While a party should fully examine the relevant facts and law before filing a motion to recuse, it still must file a recusal motion in a timely manner, which the Plaintiffs failed to do. Even assuming that the alleged partiality was not manifest until the district court announced its decision to dismiss the case, I would find the recusal motion to be untimely and would therefore affirm the district court's denial of the motion regardless of its merits.

On the merits, I do not agree that either recusal or reassignment is warranted here. As the Court correctly notes, the applicable standard for recusal or reassignment is the existence of an appearance of partiality on the part of the judge. 28 U.S.C. § 455(a). *Ante* at 25. The Court also correctly finds that "there is no extrajudicial source indicating an appearance of partiality." *Ante* at 26. To support its finding of an appearance of partiality here, the Court points to "the proceedings leading up to and including the sanctions hearing, . . . and the ultimate order of dismissal" as reflecting "a sufficiently high degree of antagonism to require reassignment of the case on remand." *Id.* As the Supreme Court has explained, however, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. "[O]nly in the rarest circumstances [can judicial rulings] evidence the degree

-28-

of favoritism or antagonism required . . . . Almost invariably, they are proper grounds for appeal, not recusal." *Id.*

When discussing the proceedings leading up to the recusal motion, the Court cites the district court's alleged "mischaracterization" of the discovery orders relating to Walls's work product as a basis for reassignment. *Ante* at 27. Even if the district court's first two orders did not explicitly address the Plaintiffs' privilege claim, the third and fourth orders did; thus, I am not convinced that the district court mischaracterized the third or the fourth orders. In fact, the Plaintiffs filed a petition for a writ of mandamus to the Eighth Circuit pertaining to the fourth order, which we denied. Despite our denial of the petition for a writ of mandamus, the Plaintiffs still had not complied with the fourth order by the December 15 hearing. Therefore, the district court's alleged mischaracterization of its own orders, at least with respect to the third and fourth orders, does not support this Court's decision to order reassignment.

The Court also condemns the district court's attitude towards the Plaintiffs, finding that the "proceedings leading up to and including the sanctions hearing, . . . and the ultimate order of dismissal, reflect[ed] [such] a high degree of antagonism" that the case must be reassigned. *Ante* at 26. However, according to the Supreme Court,

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel,

-29-

the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Liteky*, 510 U.S. at 555.[4]

Although I do not condone the district court's language, its statements did not express such a high degree of favoritism or antagonism to make fair judgment impossible. At most, the district court vented its frustration over the Plaintiffs' failure to abide by its discovery orders. The Supreme Court has held that a party does not establish bias or partiality by reciting "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Id*. at 555-56. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id*. at 556. While the district court may have failed to maintain ideal decorum, I cannot say that its statements were more than "expressions of impatience, dissatisfaction, annoyance, and even anger" that were "within the bounds of what imperfect men and women . . . sometimes display." *Id*. at 555-56; *see also United States v. Wilkerson*, 208 F.3d 794, 797-98 (9th Cir. 2000) (finding that recusal was not necessary where the district court referred to the Government's actions as "absurd" and "asinine"); *Air-Sea Forwarders, Inc. v. Air Asia Co*., 880 F.2d 176, 191 (9th Cir. 1989) (finding that recusal was not necessary where the district court stated that counsel had "'misled' the jury by blowing 'cloak and dagger smoke' at it"); *In re*

---

[4]As an example of a judicial remark that revealed such a high degree of favoritism or antagonism that fair judgment was impossible, the Supreme Court cited this remark made by a district court in "a World War I espionage case against German-American defendants: 'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.'" *Liteky*, 510 U.S. at 555 (quoting *Berger v. United States*, 255 U.S. 22, 28 (1921) (alteration in original)).

*Beard*, 811 F.2d 818, 830 (4th Cir. 1987) (finding that recusal was not necessary where the district court called a party's attorney a "son-of-a-bitch" and a "wise-ass lawyer").

The Court justifies the Plaintiffs' failure to obey the orders "because Plaintiffs presented a non-frivolous argument regarding privilege, and Defendants admit the district court did not address the privilege argument until the third order." *Ante* at 22. Whether or not the Plaintiffs presented a non-frivolous argument regarding privilege, the district court had already clearly rejected their privilege claim. The third order required the Plaintiffs to produce Walls' work product that was "currently being withheld on grounds of privilege." The fourth order stated that the Plaintiffs must

> produce any and all document[s] or analysis developed by Chris Walls relating to this litigation, regardless of whether the document is claimed as privileged or if Chris Walls relied upon said document. The documents must be produced by noon on Monday, September 11, [2006]. If these documents are not produced, Plaintiffs will not be permitted to present the testimony of Mr. Walls at trial.

The Plaintiffs filed a petition for a writ of mandamus with the Eighth Circuit regarding this discovery order, which we denied. Thus, at that point, the Plaintiffs could not have been justified in delaying or withholding production of the documents after their privilege claim had been rejected by both the district court and the Eighth Circuit. Despite this fact, the Plaintiffs still had not produced the fifty-eight documents as of the December 15 hearing. Instead, the Plaintiffs made a belated attempt to submit the documents to the district court for in camera review, which I conclude was a willful violation of the discovery order.

After learning on December 15, 2006, that the Plaintiffs had continued to disobey its discovery orders by not producing the fifty-eight documents in question when they were indisputably required to do so, the district court was understandably

-31-

perturbed. The district court's language was regrettable, but its comments do not create an appearance of such a high degree of favoritism or antagonism to make fair judgment impossible.

I also conclude that the district court did not abuse its discretion by dismissing with prejudice the Plaintiffs' lawsuit as a sanction for their willful discovery violations. I recognize that dismissal is an "extreme sanction." *See Smith v. Gold Dust Casino*, 526 F.3d 402, 405 (8th Cir. 2008). However, it is appropriate here because the Plaintiffs continually and willfully disobeyed the district court's discovery orders by refusing to produce the fifty-eight documents, failing to produce Anton for the July 6 hearing, and misrepresenting Anton's employment status, all of which prejudiced the Defendants. *See id.* ("Dismissal with prejudice is an extreme sanction and should be used only in cases of willful disobedience of a court order . . . ." (quotation and alteration omitted)).[5]

As explained above, even if the district court did not address the Plaintiffs' privilege argument until the third order, that order was issued on August 16, 2006, four months before the December 15 hearing. The fourth order was issued on September 8, 2006, more than three months before the December 15 hearing. And we denied the Plaintiffs' petition for a writ of mandamus on September 26, more than two

_____

[5]The Court explains that when analyzing a dismissal sanction, "a Rule 37 analysis normally should stand alone and not blend together with a less-structured, inherent authority analysis." *Ante* at 16. Because I agree with this proposition and because I think that Rule 37 supports the dismissal here, I find it unnecessary to discuss the e-mail production, the recorded-conversation production, Barazi's purported lies, and the purported attempt to bribe Anton. *See id.* at 18 (stating that the district court relied on these issues only with respect to its inherent authority analysis, not its Rule 37 analysis). Therefore, I limit my analysis to whether the Plaintiffs' willful refusal to produce the fifty-eight documents despite the district court's orders and their willful failure to produce Anton for the July 6 hearing provided sufficient justification for the dismissal under Rule 37.

and a half months before the December 15 hearing. The third and fourth orders clearly rejected the Plaintiffs' privilege claim. This court refused to intervene. Rather than comply with the orders by producing the fifty-eight documents to the Defendants, the Plaintiffs once again sought to inhibit and delay discovery by belatedly submitting the documents to the district court for in camera review. The Plaintiffs' "particularly evasive" tactics do not strike me as mere "technical violation[s] of the discovery order." *Ante* at 24.

Further, on June 30, 2006, the district court ordered the Plaintiffs to produce Anton for a July 6, 2006 hearing. The Plaintiffs failed to produce him, claiming at the July 6 hearing that they could not reach him because he was simply a hired outside accountant and not an employee of the Plaintiffs. However, on June 22, 2006, Anton signed an application for a liquor license renewal stating that he was the managing agent for Sentis, and on June 29, 2006, Barazi signed an application to sell liquor, which indicated that Anton was the managing officer for Sentis. From this evidence, I cannot find fault with the district court's conclusion that Anton was, in fact, more than a hired outside accountant such that the Plaintiffs misled the district court at the July 6 hearing when they claimed that they could not produce him because he was not their employee.

Based on these circumstances, I do not find an abuse of discretion in the district court's determination that the Plaintiffs willfully violated the discovery orders by failing to produce the fifty-eight documents to the Defendants and failing to produce Anton for the July 6 hearing. *See Hutchins v. A.G. Edwards & Sons, Inc.*, 116 F.3d 1256, 1260 (8th Cir. 1997) ("Plaintiffs' persistent failure to cooperate and their disregard of the district court's orders make it clear that their conduct throughout these proceedings was deliberate rather than accidental. Plaintiffs' pattern of intentional delay is the type of conduct for which the extreme sanction of dismissal with prejudice is appropriate.").

Finally, I conclude that the Plaintiffs' willful delay in producing the fifty-eight documents and willful failure to produce Anton prejudiced the Defendants. Prejudice "includes deprivation of information through non-cooperation with discovery, and costs expended obtaining court orders to force compliance with discovery." *Adams v. Trustees of the N.J. Brewery Employees' Pension Trust Fund*, 29 F.3d 863, 874 (3d Cir. 1994). While the Court argues that there is no prejudice because "[i]t appears from the record on appeal . . . that everything that might be produced has been produced to the court or to Defendants," *ante* at 24, "[p]rejudice need not be [an] 'irremediable harm,'" *Adams*, 29 F.3d at 874 (quoting *Curtis T. Bedwell & Sons, Inc. v. International Fidelity Insurance Co.*, 843 F.2d 683, 693 (3d Cir. 1988)). The Plaintiffs' willful delay in producing the fifty-eight documents required Defendants to spend their time and resources attempting to enforce the district court's orders rather than completing discovery and preparing for trial. *See Schoffstall*, 223 F.3d at 824 (finding prejudice when plaintiff's failure to produce medical records "required [the defendant] to spend its time hounding her for releases the court had already ordered her to provide"). The district court did not abuse its discretion by determining that the Plaintiffs' delay in producing the fifty-eight documents and their failure to produce Anton for the July 6 hearing constituted willful violations of the discovery orders that prejudiced the Defendants and thereby justified the dismissal of the Plaintiffs' lawsuit under Rule 37.

Accordingly, I would affirm the judgment of the district court.

_____