**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ANSEL O. BELUE; JOHNNY LUKE
LITTLE, as the duly appointed
personal representative of the
Estate of Linda Gail Little; JOEL J.
HILL; JAMES W. LYLE, JR., as the
duly appointed personal
representative of the Estate of
Peggy Jean Reynolds,

        *Plaintiffs-Appellees,*

        v.

MARKHAM R. LEVENTHAL; JULIANNA
THOMAS MCCABE; IRMA REBOSO
SOLARES,

        *Appellants,*

        and

AEGON USA, INCORPORATED;
TRANSAMERICA INSURANCE
COMPANY; LIFE INVESTORS
INSURANCE COMPANY OF AMERICA;
TRANSAMERICA LIFE INSURANCE
COMPANY,

        *Defendants.*

No. 10-1300

ANSEL O. BELUE; JOHNNY LUKE
LITTLE, as the duly appointed
personal representative of the
Estate of Linda Gail Little; JOEL J.
HILL; JAMES W. LYLE, JR., as the
duly appointed personal
representative of the Estate of
Peggy Jean Reynolds,

*Plaintiffs-Appellees,*

v.

MARKHAM R. LEVENTHAL; JULIANNA
THOMAS McCCABE; IRMA REBOSO
SOLARES,                                    No. 10-1438

*Appellants,*

and

AEGON USA, INCORPORATED;
TRANSAMERICA INSURANCE
COMPANY; LIFE INVESTORS
INSURANCE COMPANY OF AMERICA;
TRANSAMERICA LIFE INSURANCE
COMPANY,

*Defendants.*

Appeals from the United States District Court
for the District of South Carolina, at Spartanburg.
G. Ross Anderson, Jr., Senior District Judge.
(7:08-cv-03830-GRA)

Argued: January 25, 2011

Decided: May 13, 2011

Before TRAXLER, Chief Judge, and WILKINSON and GREGORY, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Traxler and Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Conrad M. Shumadine, WILLCOX & SAVAGE, PC, Norfolk, Virginia, for Appellants. Andrew Joseph Johnston, Spartanburg, South Carolina, for Appellees. **ON BRIEF:** Gary A. Bryant, David A. Kushner, WILLCOX & SAVAGE, PC, Norfolk, Virginia, for Appellants. Patrick E. Knie, PATRICK E. KNIE, PA, Spartanburg, South Carolina; Susan F. Campbell, William E. Hopkins, Jr., HOPKINS & CAMPBELL, LLP, Columbia, South Carolina; Gary E. Clary, Central, South Carolina, for Appellees.

---

## OPINION

WILKINSON, Circuit Judge:

Irma Solares, Julianna McCabe, and Markham Leventhal ("the attorneys") appeal an order revoking their pro hac vice admissions in connection with a putative class action suit. The suit alleged that the attorneys' clients breached supplemental cancer insurance policies that they had issued. The revocation was based on motions the defense attorneys filed in response to the plaintiffs' request for class certification. Chief among them was the attorneys' motion to recuse the district judge based on his comments during an earlier hearing.

The district court's comments and conduct at that hearing reflected its strong feelings about the merits of the case before it, but those feelings simply did not constitute grounds for recusal. Even though the recusal motion had little merit, we nonetheless conclude that the district court erred in revoking the attorneys' pro hac vice admissions because it did not afford them even rudimentary process. Accordingly, we vacate the revocation order of the district court.

I.

In 2007, purchasers of supplemental cancer insurance policies issued and administered by Transamerica Life Insurance Company and its predecessor, Life Investors Insurance Company, filed a number of class actions alleging that the insurers had breached the policies. Markham Leventhal, a partner in the law firm Jorden Burt LLP, served as lead counsel for the insurance companies in at least 15 of these lawsuits. Julianna McCabe and Irma Solares, two other Jorden Burt partners, joined Leventhal in representing Transamerica and Life Investors.

Three of those lawsuits are germane here. The first is *Pipes v. Life Investors Insurance Company of America*, filed in 2007 in the U.S. District Court for the Eastern District of Arkansas. The parties in that case initially decided to engage in confidential mediation, and on November 25, 2008, the Arkansas district court entered an order denying class certification. The parties subsequently negotiated for several months and ultimately reached a preliminary understanding regarding the terms of a global class action settlement.

In March 2009, the plaintiffs' counsel in *Pipes* filed a second lawsuit in Arkansas circuit court: *Runyan v. Transamerica Life Insurance Company*. This suit consolidated the claims of eight plaintiffs in six prior lawsuits pending in Arkansas and three other states. The parties finalized a class action set-

tlement agreement, filed it with the court, and obtained a preliminary approval on April 23, 2009.

This lawsuit — the third of importance — was filed in November 2008 in the U.S. District Court for the District of South Carolina. Like before, the defendants were represented by Leventhal, McCabe, and Solares ("the attorneys"). Because none of the attorneys were licensed to practice in South Carolina, they appeared in the district court pro hac vice — meaning that they were admitted to the jurisdiction "temporarily for the purpose of conducting a particular case." *Black's Law Dictionary* 1331 (9th ed. 2009). Here, Kevin Bell — an attorney admitted to the South Carolina bar — moved to have the attorneys temporarily admitted to practice in the district court and then stayed on to assist them as local counsel.

In May of 2009, the defendants — represented by the attorneys — filed a notice of settlement and a motion to stay class-related proceedings pending a decision from the Arkansas court approving the *Runyan* settlement. According to the defendants, the *Runyan* settlement encompassed the South Carolina claims alleged in the South Carolina lawsuit. The court scheduled a hearing on that motion for July 13, 2009.

That hearing forms the crux of the dispute in this case. The court began the hearing by characterizing the *Runyan* settlement as potentially collusive, stating that it might be one "of those buddy settlements that we have to watch out for." The court then took note of the *Pipes* case, making less than favorable comments about the Arkansas district court and criticizing the defendants' approach to the litigation. The court also observed that the settlement on the table was "considerably" less than a settlement the court had presided over that involved the same issues.

When McCabe informed the court that the *Runyan* settlement was actually a national settlement, the court suggested that the settlement was improper. As a result, the court denied

the defendants' motion to stay the class related proceedings and instead advised the plaintiffs to quickly file for class certification before the Arkansas court finally approved the *Runyan* settlement.

At the court's urging, the plaintiffs filed their motion for class certification the next day (July 14). The plaintiffs argued that an expedited schedule was proper because the defendants had already prepared and filed briefs responding to such motions in the other related cases, and that they had basically conceded — by agreeing to the *Runyan* settlement — to treat the case as a class action. Within 24 hours, the court expedited the class certification proceedings, ordering the defendants to file their opposition to certification by 9:00 AM on July 21.

The attorneys filed not one, but three motions on July 21. First, before 8:00 AM, they filed a motion to exceed the 35-page limitation imposed by the local rules for their opposition motion, contending that the briefs they had filed on that topic in related cases were far longer. Their motion did not reflect that they had conferred in good faith with the plaintiffs' lawyers before filing it, even though the local rules mandated such a conference. Before the 9:00 AM deadline, the court informed the attorneys' local counsel that the motion to exceed the page limitation would be denied. The attorneys accordingly edited their brief to 35 pages and filed it shortly after noon instead.

Next, the attorneys filed an emergency motion to vacate the expedited scheduling order, to continue the class certification hearing, and to establish a discovery period to examine the propriety of class treatment. Finally, and perhaps most importantly, the attorneys moved to recuse the judge pursuant to 28 U.S.C. §§ 144 and 455 on the theory that his comments and actions at the prior hearing, taken as a whole, displayed prejudice and bias against the defendants.

The court did not respond favorably. At the motions hearing on July 22, the court threatened to disbar the attorneys and local counsel for making such "serious allegations." The court also warned that he would "disbar the whole firm in Miami, Florida" if the attorneys did not appear at a second hearing a few days later. Not only that, the court expressed frustration that the defense had "los[t] the case and attack[ed] the judge." Finally, the court chided plaintiffs' counsel for failing to allege the number of plaintiffs involved in the suit, accusing them of being "highly incompetent in this case from the beginning." Other than making the comment about the attorneys "attack[ing] the judge," the court did not offer any reason for revoking the attorneys' pro hac vice status.

The revocation hearing took place a few days later, on July 27. The court began the proceedings by noting that it had perused the attorneys' website and discovered that they advertised themselves as specializing in "cases involving difficult jurisdictions" or "trouble spot jurisdictions." After asking McCabe to explain that feature of the website, the court elucidated the reasons for convening the hearing. First, the court observed that it had set a 9:00 AM deadline on July 21 for the defendants' response to the plaintiffs' class certification motion and that the attorneys had waited until 7:30 AM on the 21st to seek permission to file an overlong brief. Moreover, the court observed that the attorneys had only filed a brief of appropriate length after the 9:00 AM deadline had passed. In the court's view, the attorneys had also disregarded the local rules by failing to confer with plaintiffs' counsel before filing their motions.

The court also concluded that the attorneys had filed their motions in bad faith. The court suggested that the defendants' opposition to class certification here was inconsistent with its concession in Arkansas that certification of a nationwide class was proper. What is more, the court found it "ridiculous" that the attorneys had argued for a stay of class certification proceedings on the theory that their "due process rights ha[d]

been violated" given that they had filed some 87 pages of
motions on the subject. Perhaps most importantly, however,
the court concluded that the recusal motion was "inappropri-
ate" because "[n]othing presented in the motion for recusal
demonstrate[d] any alleged bias against the defendants."

The hearing did not last much longer. The court briefly
questioned McCabe about the value of the settlement. The
court questioned Kevin Bell — the attorneys' local counsel —
about why he had "put [his] name on" the recusal motion. Bell
discussed his concerns about the judge's comments at the ini-
tial hearing, and the court responded by asking where he got
the notion that "[i]f you don't win a motion . . . that [is]
grounds for recusal." Finally, the court revoked the attorneys'
pro hac vice status without imposing any sanctions on local
counsel. In closing, the court noted:

> I permitted those people to come in as a matter of
> grace, a matter of discretion. And now they have
> violated it. And I'm not going to let them stay. All
> they want to do is file papers, file papers, file papers.
> And then run out of this courtroom, go back to
> Miami and say, we won another one in a difficult
> jurisdiction. That's the kind of lawyers they are. I
> don't want anything to do with them, or anybody of
> that same ilk. I think they are a disgrace to the pro-
> fession. You can appeal it.

Several months later, the parties to the underlying action
reached a settlement. The lawsuit was thus dismissed on Feb-
ruary 11, 2010. On February 22, the attorneys moved to
vacate the revocation order, alleging that the revocation was
unfounded and had caused them to suffer serious professional
and reputational consequences. The court denied the motion,
and the defendants timely appealed.

## II.

In order to evaluate whether the district court erred in
revoking the attorneys' pro hac vice status, we must first ana-

lyze the conduct that led the court to take that admittedly rare step.

### A.

In the July 27 revocation hearing and in its subsequent order, the court announced several reasons for deciding to revoke the attorneys' pro hac vice status: the attorneys' failure to confer with opposing counsel before requesting a page extension for the class certification response, their failure to file that response in a timely fashion, the alleged inconsistency between their positions in state and federal court over the propriety of class action treatment, and their claims that the scheduling order denied them due process.

However, there is ample basis to think that the principal reason for the court's decision was the recusal motion filed by the attorneys. When the court raised the possibility of revocation during the July 22 hearing, it referred to the fact that the defendants had tried to "disqualify" the judge, summarizing their approach as, "[y]ou lose the case and attack the judge." Moreover, during the revocation hearing, the court characterized the motion in stark terms, calling it "the most inappropriate motion in the world." The court hewed to this approach in its written order as well, listing the motion as the first grounds for revocation and stating that it was "inappropriate, dilatory[,] and without a valid basis." The court then went on to spend several pages explaining why "[n]othing presented in that motion even remotely demonstrates bias against the defendants."

It is true, of course, that the court's order listed several bases for revocation and asserted that its decision was based on the totality of the circumstances. But it seems equally certain that absent the recusal motion, the remaining conduct — relatively minor violations of local rules and filings containing controversial arguments — would not have caused the

judge to take the steps that he did. Therefore, we turn to analyzing the propriety of the recusal motion.

B.

Judicial recusals are governed by a framework of interlocking statutes. Under 28 U.S.C. § 455(a), all "judge[s] of the United States" have a general duty to "disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned." In turn, the following subsection, 28 U.S.C. § 455(b), offers a list of other situations requiring recusal, one of which is where a judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).

Section 455 speaks in the most general of terms. The Supreme Court's opinion in *Liteky v. United States*, 510 U.S. 540 (1993), provides the most complete explanation of these recusal requirements. In that case, the Court confronted a situation where defendants moved to disqualify the district judge in their criminal trial based on his comments and actions as the judge in a prior trial involving one of the same defendants. In ruling that the judge did not have to recuse himself, the Court concluded that both § 455(a) and § 455(b)(1) carry an "extrajudicial source" limitation, *id.* at 551, 554, under which bias or prejudice must, as a general matter, stem from "a source outside the judicial proceeding at hand" in order to disqualify a judge, *id.* at 545. Put differently, the bias or prejudice must "result in an opinion on the merits [of a case] on some basis other than what the judge learned from his participation in the case." *Id.* at 545 n.1 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)).

Of course, the Court was careful to not make the extrajudicial source limitation an ironclad rule. As it went on to observe, an extrajudicial source of bias is neither sufficient nor necessary for recusal: it is insufficient because "some

opinions acquired outside the context of judicial proceedings . . . will not suffice," and it is not always necessary because "predispositions developed during the course of a trial will sometimes (albeit rarely) suffice." *Id.* at 554. Nevertheless, the Court did make clear that parties would have to meet a high bar to achieve recusal based on in-trial predispositions. As the Court explained, judicial rulings and "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" almost "never constitute a valid basis for a bias or partiality motion." *Id.* at 555. Likewise, judicial remarks that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.*

Thus the only cases where courts have granted recusal motions based on in-trial conduct tend to involve singular and startling facts. In *Liteky*, the Court provided an example of such conduct: the district judge's remark in an espionage case against German-American defendants that "'[o]ne must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.'" *Id.* at 555 (quoting *Berger v. United States*, 255 U.S. 22, 28 (1921)). With this example in mind, courts have only granted recusal motions in cases involving particularly egregious conduct. Thus, in *United States v. Antar*, 53 F.3d 568 (3d Cir. 1995), the Third Circuit concluded that the defendants in a criminal case should have received a new trial in a situation where the judge made clear that his "object in th[e] case from day one" had been to recover funds that the defendants had taken from the public. *Antar*, 53 F.3d at 573. Recusal would have been proper there because "the district judge, in stark, plain and unambiguous language, told the parties that his goal in the criminal case, from the beginning, was something other than what it should have been and, indeed, was improper." *Id.* at 576. Likewise, in *Sentis Group, Inc. v. Shell Oil Co.*, 559 F.3d 888 (8th Cir. 2009), the court of appeals concluded that recusal would have been appropriate

(and thus reassigned the case on remand) under § 455(a) where the judge "directed profanities at Plaintiffs or Plaintiffs' counsel over fifteen times" and refused to allow the plaintiffs to present argument at the sanctions hearing. *Sentis Group*, 559 F.3d at 904-05. Similar examples are, thankfully, not easy to find.

The high bar set by *Liteky* for predispositional recusals makes good sense. If it were otherwise — if strong views on a matter were disqualifying — then a judge would hardly have the freedom to be a judge. Indeed, the Court went on to note that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display," are generally insufficient to support a recusal motion. *Liteky*, 510 U.S. at 555-56. "A judge's ordinary efforts at courtroom administration — even a stern and short-tempered judge's ordinary efforts at courtroom administration — remain immune." *Id.* at 556; *see also LoCascio v. United States*, 473 F.3d 493, 495-96 (2d Cir. 2007). This is not to say judicial distemper is somehow admirable. It is not. But the alternative of purging through recusal motions all those with strong or strongly stated beliefs not only threatens limitless gamesmanship but the fearless administration of justice itself.

Taking note of *Liteky*'s high bar for recusal, other courts have generally declined to grant recusal motions based on in-trial "predispositions" — especially when they involve alleged bias or prejudice against the attorneys rather than the parties. For example, in *In re Beard*, 811 F.2d 818 (4th Cir. 1987), this court held that "[b]ias against an attorney is not enough to require disqualification under § 455 unless petitioners can show that such a controversy would demonstrate a bias against the party itself." *Beard*, 811 F.2d at 830. This approach makes good sense as well: insofar as § 455(b)(1) requires recusal whenever a judge "has a personal bias or prejudice concerning a *party*," 28 U.S.C. § 455(b)(1) (empha-

sis added), recusal should only be required when bias against an attorney is "of a continuing and personal nature" and rises to the level of "demonstrat[ing] a bias against the party itself." *Beard*, 811 F.2d at 830.

Hence, in *Beard*, the court declined to conclude that recusal was required where the judge allegedly used profanities to refer to counsel, on the theory that the conduct was limited in nature and did not reflect any bias against the parties. *Id.* Other courts have followed suit. *See, e.g.*, *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1316 (2d Cir. 1988) (concluding that recusal was not required where judge criticized attorneys and observing that "[a]n appellate court, in passing on questions of disqualification . . . determines the disqualification on the basis of conduct which shows bias or prejudice or lack of impartiality by focusing on a party, not on counsel"); *In re Cooper*, 821 F.2d 833, 843-44 (1st Cir. 1987) (concluding that recusal was not necessary where judge told one of the litigants that he "has no credibility" and "may be a fit candidate for a perjury indictment").

The upshot of these cases is clear: while recusal motions serve as an important safeguard against truly egregious conduct, they cannot become a form of brushback pitch for litigants to hurl at judges who do not rule in their favor. If we were to "encourage strategic moves by a disgruntled party to remove a judge whose rulings the party dislikes," *In re United States*, 441 F.3d 44, 67 (1st Cir. 2006), we would make litigation even more time-consuming and costly than it is and do lasting damage to the independence and impartiality of the judiciary. In other words, recusal decisions "reflect not only the need to secure public confidence through proceedings that appear impartial, but also the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *Id.* (quoting *In re Allied-Signal Inc.*, 891 F.2d 967, 970 (1st Cir. 1989)).

## C.

These principles make it quite difficult to present any convincing case for the recusal motion that the attorneys filed below. The attorneys cited four specific reasons for recusal: the district court's expressions of skepticism about the *Runyan* state court settlement, its comparisons of the *Runyan* settlement to a prior settlement the court had presided over, its decision to "coach" the plaintiffs' counsel, and its comments about another district judge in Arkansas. But none of these asserted rationales provides a basis for the drastic remedy of recusal.

For starters, three of those four reasons represent nothing more sinister than the court's strong views about the merits of the case and about how to best handle it. Take, for example, the attorneys' assertion that the court "wrongly prejudged" the case by comparing the settlement here to the settlement in a related class action. Whether or not the cases are similar, the mere fact of drawing a comparison does not prove that the judge had a result in mind prior to starting the trial. *See Liteky*, 510 U.S. at 555 ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings[ ] do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."). Likewise, the court's description of the *Runyan* settlement as a "buddy settlement[ ]" and suggestion that the "whole thing smells" may have been strongly worded, but did not establish that the judge had a "preconceived bias," as the recusal motion alleged. *Id.* ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.")

Finally, the court's decision to expedite the class certification proceedings — both by encouraging plaintiffs' counsel to

file their motion and by requiring a quick turnaround on the defendants' response — need not be viewed as "affirmative bias in favor of Plaintiffs" so much as "[a] judge's ordinary efforts at courtroom administration — even a stern and short-tempered judge's ordinary efforts at courtroom administration." *Id.* at 556. And while the plaintiffs urge us to place the worst possible gloss on each of the court's actions, that is not an approach the law allows us to take. Recusals are not — and cannot — be taken so lightly.

The sole remaining basis for recusal, then, is the court's less-than-favorable remarks about the district judge presiding over the *Pipes* case in the Eastern District of Arkansas — a related lawsuit that was folded into the *Runyan* settlement. These remarks were neither wise nor temperate. They should not have been made. But they, too, did not rise to the level of recusable conduct. The remarks were directed at a different judge who had little to do with the case at hand. Thus, while we would never suggest that the judge's remarks were well-considered, neither did they go to the court's integrity or provide any basis for believing that the court's "impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or that the court "ha[d] a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b)(1).

Litigation is often a contentious business, and tempers often flare. But to argue that judges must desist from forming strong views about a case is to blink the reality that judicial decisions inescapably require judgment. Dissatisfaction with a judge's views on the merits of a case may present ample grounds for appeal, but it rarely — if ever — presents a basis for recusal. *See Liteky*, 510 U.S. at 555 ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.").

On this latter score, the recusal motion was decidedly ill founded. To sum up, the Supreme Court's decision in *Liteky*

seems to us the best and most comprehensive explanation of § 455(b), and motions for predispositional recusals that are so at odds with that decision run the risk of sanctionable conduct. No appellate court can afford to leave trial judges prey to a slew of groundless calls for recusal from litigants whose major objection to those judges appears to be a perceived disagreement with them. Appellate courts must remain cognizant that trial judges make some of the most difficult calls on some of the most volatile matters in our system. Those judges are singularly exposed to the displeasure of counsel and litigants alike, and the motion in this case cannot become a contagion that is permitted to spread.

## III.

Our conclusion that the recusal motion lacked merit does not resolve this case, however, for we must also analyze whether the attorneys received adequate process before their pro hac vice status was rescinded.

## A.

When the court first raised the possibility of pro hac vice revocation, it did not offer any specific basis for its decision. Instead, it threatened to disbar the attorneys (and their local counsel) for making "serious allegations," voiced its frustration at the attorneys for "los[ing] the case and attack[ing] the judge," and scheduled a hearing on the matter. It was only at the July 27 hearing that the court listed its reasons for believing revocation was appropriate. Even then, however, the court did not allow the attorneys much of an opportunity to respond: after a brief back-and-forth with McCabe about the value of the *Runyan* settlement and a short discussion with the attorneys' local counsel, the court decided to revoke the attorneys' right to practice.

The judge's own comments about revocation hint at what may have driven him to act with such haste. After making his

decision, the court observed: "I permitted those people to come in *as a matter of grace, a matter of discretion*. And now they have violated it. And I'm not going to let them stay." (emphasis added). On its view, when courts allow attorneys to practice pro hac vice, they do so as a matter of pure benevolence, meaning they can revoke the right to practice at any time.

The principal problem with this view, however, is that it has been widely rejected. While pro hac vice status was "at one time . . . considered to be granted and held at the grace of the court," such an approach does not accord with the modern practice of law. *Johnson v. Trueblood*, 629 F.2d 302, 303 (3d Cir. 1980). The legal profession has become a national one, and justice in any true sense must transcend the parochial. If pro hac vice attorneys become subject to uniquely preemptory dismissals, then federal courts will be lesser bulwarks against local favoritisms, and less able to perform the national task that has been theirs since Article III originally assigned it. "[I]n this era of interstate practice," especially, notions of judicial grace thus "cannot be applied too literally or strictly." *Id.* In recognition of this modern reality, as well as the fact that pro hac vice attorneys are "held to the same professional responsibilities and ethical standards as regular counsel," courts have increasingly proved willing to conclude that pro hac vice attorneys should not be disqualified "under standards and procedures any different or more stringent than those imposed upon regular members of the district court bar." *Cole v. U. S. Dist. Ct. for the Dist. of Idaho*, 366 F.3d 813, 821 (9th Cir. 2004) (quoting *United States v. Collins*, 920 F.2d 619, 626 (10th Cir. 1990)).

Thus, while it may be true that no attorney has a due process right to pro hac vice status, *see Leis v. Flynt*, 439 U.S. 438 (1979) (per curiam), once such status is granted, attorneys must receive some modicum of due process before it is revoked. *See, e.g.*, *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109-10, 1113 (9th Cir. 2005) ("[N]otice and an opportunity

to be heard are indispensable prerequisites for the types of sanctions imposed by the district court," which included pro hac vice revocation); *Martens v. Thomann*, 273 F.3d 159, 175 (2d Cir. 2001) ("[R]evocation of pro hac vice status is a form of sanction that cannot be imposed without notice and an opportunity to be heard."); *Kirkland v. Nat'l Mortgage Network, Inc.*, 884 F.2d 1367, 1371 (11th Cir. 1989) ("[A]n attorney, once admitted pro hac vice, enjoys . . . basic procedural rights."); *Johnson*, 629 F.2d at 303 ("[W]e believe that some type of notice and an opportunity to respond are necessary when a district court seeks to revoke an attorney's pro hac vice status."). In view of the fact that we have concluded that due process protections apply in somewhat analogous contexts, we agree that some modicum of due process should attach to pro hac vice revocation. *See Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 42 (4th Cir. 1995) ("[A] Rule 37 fine is effectively a criminal contempt sanction, requiring notice and the opportunity to be heard.").

Of course, the amount of process required is hardly onerous. While courts are generally in agreement that pro hac vice attorneys must receive notice of the specific grounds for revocation and a meaningful opportunity to respond, none have been willing to extend due process protections beyond those baselines. Indeed, the specific contours of such process are often left to the district court's discretion. For example, courts have left "the form of the notice to the discretion of the district court" so long as the attorney receives notice of "the conduct of the attorney that is the subject of the inquiry, and the specific reason this conduct may justify revocation." *See Johnson*, 629 F.2d at 304. With respect to the opportunity to respond, it is likewise preferable to accord the district court wide discretion in tailoring the appropriate level of process. *See id.* ("All that we will mandate is that the attorney be given a meaningful opportunity to respond to identified charges. Of course in certain cases a full hearing might be desirable, but we leave that to the discretion of the district court.").

This approach embodies an appropriate sense of balance. On the one hand, it is crucial to ensure that pro hac vice attorneys are not the victims of whimsical revocations or discriminatory treatment. For "some sort of procedural requirement serves a number of salutary purposes. It ensures that the attorney's reputation and livelihood are not unnecessarily damaged, protects the client's interest, and promotes more of an appearance of regularity in the court's processes." *Id.* at 303.

At the same time, it is essential to prevent revocation proceedings from burdening the courts with excessive process. Discretion must therefore play a role, so long as the court satisfies the minimal requirements of an individualized notice of the basis for revocation and a meaningful opportunity to respond. To require much beyond that begins to erode the trial court's authority over those who appear before it. In granting counsel admission, the court was still obligated to supervise the attorneys' conduct, so long as in doing so, it did not violate due process. For the national character of the federal judiciary must rest in the end upon a foundation of nationwide respect for local federal district tribunals.

B.

In determining whether the rudiments of process were provided here, it is best to look at the proceedings in their entirety. For due process at bottom embodies a basic sense of fairness, which can best be gauged by viewing all the relevant circumstances. Looking at the record as a whole, we cannot conclude that the district court satisfied the basic requirements of due process. For starters, the notice given here was certainly wanting. When the court first raised the possibility of revocation, it did not provide an appropriate list of reasons for considering that result. In fact, at the July 22 hearing, the court merely raised the possibility of revoking both the attorneys' and their local counsel's right to practice and then scheduled a hearing for July 27. The closest the court came to providing a basis for its actions was its sweeping expres-

sion of frustration at counsel for "los[ing] the case and attack-[ing] the judge." Even in the notice for the July 27 hearing, the court provided no indication of the specific behavior that would be discussed. And at no point did the judge ever mention that the local rules violations might have anything to do with his decision. It was only at the July 27 hearing that the court first set forth its bill of particulars against the attorneys — notice that came too late in the game.

That lack of notice in turn worked to deny the attorneys a meaningful opportunity to be heard. At the July 22 hearing, neither Solares nor McCabe was present. And while Leventhal did attend, he was only allowed to make a few short statements to the court:

> THE COURT: All right, did you have anything to do with signing all these papers and filing them about ten or twelve hours before court?
>
> MR. LEVENTHAL: Are you referring —-
>
> THE COURT: Yes or no. Yes or no.
>
> MR. LEVENTHAL: I would say yes, Your Honor.
>
> THE COURT: All right, then you will be in the group, too, to be disbarred, or your admission to practice before this court will be eliminated.

At no point was Leventhal allowed to explain his conduct or his involvement in the case. Indeed, between July 22 and July 27, the attorneys were left in the dark, unable to do more than guess about the possible reasons for revocation. Nor did the court cure this flaw by allowing the attorneys to mount a thorough defense at the hearing. To the contrary, the court essentially prevented them from speaking, questioning McCabe about her law firm website profile and both her and Leventhal

about the value of the *Runyan* settlement before summarily revoking all three of the attorneys' pro hac vice status.

Finally, the judge failed to conduct any individualized inquiry or analysis at the revocation hearing. *See Johnson*, 629 F.2d at 304 (requiring courts to provide specific notice of potentially sanctionable conduct). The record establishes that the three attorneys had disparate levels of involvement with the actions that incensed the court. Solares, for example, participated only in the discovery proceedings and had no involvement with either the recusal motion or the motion to stay class proceedings, although she did sign them. McCabe worked on the stay motion and signed both it and the recusal motion, but claims to have only reviewed and performed some research for the latter filing. Leventhal, by contrast, was heavily involved in drafting the recusal motion. Yet the court did not question the attorneys about their relative levels of involvement at all, nor did it once refer to them individually. And it is no answer to claim that the court did not have these facts in front of it at the initial hearing; when filing their motion to vacate the revocation, the attorneys provided declarations summarizing their conduct, but the court did not change its earlier order. On several instances, then, the court adopted a shotgun approach rather than the scalpel more suited to the situation.

Taken separately, it is doubtful that each of these flaws would be sufficient to condemn the revocation proceedings. After all, the level of process attaching to something as fleeting as pro hac vice status is both flexible and modest. But taken together, the net effect of the procedural flaws was to deny the attorneys any opportunity to present a meaningful response to the court's concerns.

## C.

The plaintiffs offer several responses to the defense attorneys' due process claim, but none are convincing. First, the

plaintiffs argue that by mentioning the possibility of revocation at the July 22 hearing, the court gave the defense attorneys adequate notice. But giving notice that revocation is on the table does not give the parties a meaningful opportunity to prepare a response any more than telling a defendant he might be criminally prosecuted gives him an opportunity to prepare a defense to the specific charges that may be filed against him. The level of notice required may be flexible, but it does not stretch quite so far as to require such guesswork by attorneys subject to a sanction that may cause severe harm to their professional reputations.

Next, the plaintiffs argue that the attorneys did not suffer from a denial of due process because they did not claim such a denial at the sanctions hearing. It is true that after the court informed the attorneys of its possible grounds for revocation, the attorneys' local counsel's immediate responses were to apologize and then ask for the judge to convene a three-judge panel to hear the matter. But what the attorneys did when first confronted with the arguments against their conduct does not prove that the process they received was sufficient. After all, faced with an undeniably disapproving bench, an apology was certainly a reasonable reaction. And the fact that the attorneys' sole other response was to ask for a procedural protection that they believed was generally available in revocation proceedings only highlights the degree to which they were left in the dark about the basis of the court's position. In other words, absent notice of the grounds for revocation, it was no doubt difficult to come up with a more substantive response.

In sum, while the law did not guarantee the attorneys extensive process, the court failed to give them the bare minimum. On that score, one fact is particularly illustrative: at oral argument, the plaintiffs candidly conceded that it would be "intellectually dishonest" to claim that Solares had much to do with the filings at issue and that the court had erred in sanctioning her. But before the district court, Solares hardly had a chance to make her case. This is not to say that the court would nec-

essarily have been persuaded. Solares signed the recusal motion, and attorneys are fully responsible for the documents they sign. But part of the purpose of due process is — like allocution — to give even those who may have taken a wrong turn a chance to explain the circumstances or to express whatever level of contrition that reflection upon those circumstances makes appropriate. Here, it is difficult to see how the court gave the attorneys the proper level of individualized consideration, let alone much else.

## IV.

None of this is to suggest that either party to this whole affair conducted itself nobly. The attorneys filed a baseless recusal motion seemingly driven by a fear of losing on the merits — conduct that is unbecoming of members of a distinguished profession. For its part, the district court offered comments that contributed little to a decorous courtroom atmosphere and committed an error of its own in revoking the attorneys' admissions without affording them even the minimal process that the law requires. While our normal ruling might be to remand the case with directions for the provision of appropriate process, we can see little to be gained by such a course. The case has now been resolved, and we therefore vacate the revocation order and remand the case with directions that the matter be concluded forthwith.

*VACATED AND REMANDED*