**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-4760

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

AARON RICHARDSON, a/k/a Jit,

Defendant - Appellant.

No. 17-4761

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CEDRIC GERARD COOK,

Defendant - Appellant.

No. 17-4770

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LEO CHADWICK

        Defendant - Appellant.

---

**No. 18-4023**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

LEWIS EDMOND ANDREWS, JR.,

        Defendant - Appellant.

---

**No. 18-4024**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

RONNIE JEREMY THOMPSON

        Defendant - Appellant.

---

Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington.  Terrence W. Boyle, Chief District Judge.  (7:16-cr-00122-BO-7; 7:16-cr-00122-BO-8; 7:16-cr-00122-BO-6; 7:16-cr-00122-BO-1; 7:16-cr-00122-BO-2)

---

Argued:  September 18, 2019                    Decided:  December 12, 2019

---

Before WYNN, DIAZ, and FLOYD, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:**  Joseph Bart Gilbert, TARLTON POLK PLLC, Raleigh, North Carolina; Michael W. Patrick, LAW OFFICE OF MICHAEL W. PATRICK, Chapel Hill, North Carolina; Camden Robert Webb, WILLIAMS MULLEN, Raleigh, North Carolina; Seth Allen Neyhart, STARK LAW GROUP, PLLC, Chapel Hill, North Carolina; M. Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Winston-Salem, North Carolina, for Appellants.  Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  G. Norman Acker III, First Assistant United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Before us is a consolidated appeal arising from the sentencings of five Defendants-Appellants: Aaron Richardson; Cedric G. Cook; Leo Chadwick; Lewis E. Andrews, Jr.; and Ronnie J. Thompson. As part of a dogfighting-related investigation in eastern North Carolina, all were charged with, and each pleaded guilty to, various federal dogfighting and drug-trafficking offenses. Throughout their sentencing hearings, the district court made several remarks related to dogs, dogfighters, and dogfighting. Eventually, the district court sentenced each save one to an above-Guidelines sentence. On appeal, Defendants-Appellants challenge the district court judge's failure to *sua sponte* recuse himself and the reasonableness of their sentences. For the following reasons, we affirm the district court's judgment as to each Defendant.

I.

In October 2015, federal and state authorities began a dogfighting investigation focused on Onslow and Cumberland Counties in North Carolina. During this investigation, authorities infiltrated that dogfighting community and so attended its various dogfights and acquainted themselves with its participants. Among these participants were Defendants, who were eventually arrested and charged with, most relevantly, violations of the Animal Welfare Act, 7 U.S.C. §§ 2131–2159.

In time, each pleaded guilty to various offenses. Andrews, Chadwick, Cook, and Thompson pleaded guilty to conspiracy to violate the Animal Welfare Act. Cook and Richardson pleaded guilty to possessing an animal in an animal-fighting venture. Cook

4

and Thompson pleaded guilty to sponsoring and exhibiting an animal in an animal-fighting venture. And Chadwick and Richardson pleaded guilty to possessing, training, transporting, and delivering an animal in an animal-fighting venture and aiding and abetting. Lastly, Andrews pleaded guilty to distributing a quantity of heroin and aiding and abetting, and Cook pleaded guilty to attending an animal-fighting venture.

At their sentencing hearings in the Eastern District of North Carolina, Defendants' involvement with dogfighting was described.[1] To different degrees, all had long owned, bred, and trained dogs; participated in dogfights; possessed dogfighting paraphernalia; and engaged in local and online dogfighting communities. Executing search warrants, authorities seized not only dogs but also veterinary supplies, medicine, training tools, and fighting-dog pedigrees from Defendants' properties. Particularly, sixty-four dogs were seized from Andrews's property; thirty-three dogs were seized from Chadwick's property; thirty-two dogs were seized from Richardson and Thompson's property; and twenty-three dogs were seized from Cook's property.

At Defendants' hearings, the government presented evidence of Defendants' dogfighting operations. Testimony by a government witness described Chadwick's property, which exemplified a "typical dog yard": dozens of dogs were kept about "a foot" apart, housed in "half barrels cut [out] to be homes," and chained to "large, metal pipe[s]

---

[1] These facts are drawn from the district court's written orders as to each Defendant; those orders, in turn, drew from the Presentence Investigation Report prepared for each Defendant. Defendants did not object to the factual information in the reports, and the district court adopted them.

or tire iron[s]" with heavy chains. J.A. 837–38. Pictures illustrated not only kennels "completely covered with feces, urine[,] and some type of worm," J.A. 852, but also the recovered dogs' injuries, like puncture wounds that "ooz[ed]" blood and scarring "on their legs, their ears, the top of their head, around their throat, [and] their muzzle," J.A. 848. Videos depicted behavioral tests in which recovered dogs bit stuffed dogs "so hard that [they] cause[d] [themselves] to bleed." J.A. 857. And reports explained how many of the recovered dogs were euthanized because they were too aggressive to rehome. Still other evidence was physical: large collars, weighted chains, and blood-covered training tools were also presented at the hearings.

The sentencing judge's remarks during these hearings form a large part of this appeal. As most relevant here, while discussing perceptions of certain dog breeds, the judge stated[2]: "We know from antidotes [sic], not part of this case but part of the facts or folklore you can take into judicial notice, that if a child might wander into an unprotected area that sometimes a child is mauled and killed by pit bulls." J.A. 842. Replying to the government witness's statement that fighting dogs are not typically taken to public places, like dog parks, the judge noted: "They're hiding them because they're criminal dogs." J.A. 858. And after the close of the government's evidence as to Chadwick—after testimonial, visual, and physical evidence was presented—and following Chadwick's counsel's argument for a sentence "around the guideline range," J.A. 891, the judge replied: "Either

---

[2] The sentencing judge made other similar remarks, but the ones quoted here are representative of the rest.

6

the dogs have to be eliminated from the world or the people who fight the dogs or both . . . I'll try to be reasonable and be proportional with the sentence, but I find . . . the guideline to grossly under-represent society's need for protection . . . ." J.A. 892.  Defendants never objected to the sentencing judge's statements nor sought his recusal.

Finally, the judge sentenced each Defendant.  Neither the government nor Defendants objected to the following advisory Guidelines ranges: Thompson to 24–30 months; Chadwick to 12–18 months; Cook to 15–21 months; Richardson to 12–18 months; and Andrews to 87–108 months.  The judge, however, sentenced Defendants as follows: for Thompson, Chadwick, Cook, and Richardson, he imposed above-Guidelines sentences of 48, 60, 45, and 96 months, respectively; for Andrews, he imposed a within-Guidelines sentence of 108 months.

These timely appeals followed, which were consolidated for our review.


II.

First, Defendants contend that the sentencing judge's strong, personal feelings about pit bulls and dogfighting required the judge's *sua sponte* recusal from sentencing them.

Because Defendants' did not preserve this recusal argument, we review only for plain error.  *See Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 592 (4th Cir. 2015); *see also* Fed. R. Crim. P. 52(b).  Under this standard of review, Defendants must show that an error occurred, that it was plain, and that it affected their substantial rights.  *United States v. Rooks*, 596 F.3d 204, 212 (4th Cir. 2010) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)).  Even if a plain error exists, we have the discretion to correct it, which

7

we may exercise if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted) (quoting *Olano*, 507 U.S. at 732).

As an initial matter, it is helpful to disentangle two related—but distinct—threads of law governing judicial recusal. Recusal may be required under either the Due Process Clause or federal recusal statutes. Yet Defendants apparently conflate constitutional and statutory recusal doctrine, discussing precedent pertaining to each to make a general point about the sentencing judge's purported bias. For instance, Defendants begin by quoting 28 U.S.C. § 455, a federal recusal statute. But they then cite both precedent construing that statute and precedent involving constitutional recusal doctrine in arguing that the judge was required to *sua sponte* recuse himself—without ever clearly stating whether the judge should have done so on constitutional grounds, statutory grounds, or both. This is understandable, as a judge's conduct and its appearance to others is often the crux of the inquiry under both doctrines.

But the "Due Process Clause demarks only the outer boundaries of judicial disqualifications." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986)). In fact, most recusal questions are "answered by common law, statute, or the professional standards of the bench and bar." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). So though "there may certainly be areas" where constitutional and statutory requirements overlap, a statutory violation "does not automatically mean the defendant was denied constitutional due process." *Davis v. Jones*, 506 F.3d 1325, 1336 (11th Cir. 2007).

8

Mindful of these principles, we consider constitutional recusal dictates first before turning to the statutory ones.[3]

A.

Under the Due Process Clause, recusal is required when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). We ask "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (internal quotation marks omitted) (quoting *Caperton*, 556 U.S. at 881). An unconstitutional failure to recuse is structural error and thus not amenable to harmless-error review. *Williams*, 136 S. Ct. at 1909–10.

Because "most matters relating to judicial disqualification [do] not rise to a constitutional level," *Caperton*, 556 U.S. at 876 (alteration in original) (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948)), it is the "extraordinary situation where the Constitution requires recusal," *id.* at 887. These situations may be largely categorized as instances when an extraordinary financial interest exists between a judge and a litigant,

---

[3] Though Defendants' recusal argument did not clearly demarcate constitutional from statutory doctrine, "we are not bound by the parties' characterization of the legal principles," and we may "recast appellate arguments . . . to more accurately reflect their nature." *United States v. Engle*, 676 F.3d 405, 415 n.5 (4th Cir. 2012). In the interest of analytical clarity, we discuss each separately here.

*see, e.g.*, *Caperton*, 556 U.S. at 884 (requiring recusal of elected state court judge in case involving corporation whose CEO had contributed about $3 million to judge's election campaign following lower court's entry of $50 million judgment against corporation when it was likely that corporation would seek review in state supreme court), when a judge acts as a significant part of the accusatory process before presiding over the accused's trial, *see, e.g.*, *Williams*, 136 S. Ct. at 1903 (requiring recusal of judge before whom defendant appeared seeking relief from a death sentence where the judge had, as district attorney, given approval to seek death penalty against defendant); *In re Murchison*, 349 U.S. 133, 136 (1955) (requiring recusal of judge when judge acts as a "one-man grand jury" by hearing testimony qua grand jury, presiding over contempt hearing of grand jury witnesses qua judge, and holding grand jury witnesses in contempt for their conduct before judge qua grand jury), or when a judge is involved in a running, bitter controversy with a litigant, *see, e.g.*, *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971) (requiring recusal of judge in a litigant's contempt trial when that litigant continuously, "cruelly slandered" the judge).

Simply put, an extraordinary situation is not before us. For one, no constitutional potential for bias exists. There was no actual or apparent financial interest between the parties and the sentencing judge; the sentencing judge had no financial stake in the outcomes of these cases. Nor did the judge participate in the accusatory process by, say, acting as a one-person grand jury. *Cf. In re Murchison*, 349 U.S. at 136. And, given the vivid photos, videos, and testimony about dogfighting, the judge's remarks are better characterized as "expressions of impatience, dissatisfaction, annoyance, and even anger," *see Liteky v. United States*, 510 U.S. 540, 555–56 (1994), rather than an indication that the

10

judge is embroiled in a running, bitter controversy with Defendants, *cf. Mayberry*, 400 U.S. at 465. Further still, the average judge in a position such as this—that is, selected to preside over a multiple-defendant sentencing, exposed to perturbing evidence in the course of so presiding, yet having no connections to Defendants otherwise—is objectively likely to be neutral. All told, the sentencing judge's conduct below—injudicious though it was—did not amount to an extraordinary situation that constitutes a violation of due process.

B.

We turn next to Defendants' argument that 28 U.S.C. § 455 required the *sua sponte* recusal of the sentencing judge.

Though "a framework of interlocking statutes" governing recusals exists, *Belue v. Leventhal*, 640 F.3d 567, 572 (4th Cir. 2011), at issue here is 28 U.S.C. § 455. Under subsection 455(a), all "judge[s] of the United States" must "disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned." 28 U.S.C. § 455(a); *see also Belue*, 640 F.3d at 572. And subsection 455(b), in contrast to subsection 455(a)'s general dictate, enumerates specific instances requiring recusal, the first of which is relevant here: Judges must recuse themselves when they have "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." § 455(b)(1).

The terms "impartiality" and "bias or prejudice" connote instances of partiality or opinions that are "somehow wrongful or inappropriate." *Liteky*, 510 U.S. at 550–52 (emphases omitted). Generally, the bias or prejudice required for recusal under subsections

11

455(a) and 455(b)(1) originates from "a source outside the judicial proceeding at hand." *Id.* at 545. Yet the key inquiry is broader, for "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555.

This is a "high bar for recusal." *Belue*, 640 F.3d at 574. So judicial remarks that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases," do not typically suffice. *Liteky*, 510 U.S. at 555. And judicial remarks that express "impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" virtually never establish bias or partiality. *Id.* at 555–56; *see, e.g.*, *Sentis Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888, 904–05 (8th Cir. 2009) (requiring recusal when judge "directed profanities at Plaintiffs or Plaintiffs' counsel over fifteen times" and barred plaintiffs from arguing at sanctions hearing).

Defendants have not met this high bar. For one, most of the sentencing judge's remarks were based on facts that the judge learned during the sentencing hearings, which "almost never constitute a valid basis for a bias or partiality motion." *Belue*, 640 F.3d at 573 (internal quotation marks omitted) (quoting *Liteky*, 510 U.S. at 555).

More fundamentally, however, the entire record clarifies that the sentencing judge's challenged remarks were "expressions of impatience, dissatisfaction, annoyance, and even anger." *Liteky*, 510 U.S. at 555–56. The sentencing judge's remarks made at the beginning

12

and throughout most of the sentencing hearings here were straightforward statements uttered in many a sentencing hearing. Yet as the hearings—and the presentation of evidence—continued, the judge's remarks became more indecorous. Indeed, the judge's most injudicious remarks—"Either the dogs have to be eliminated from the world or the people who fight the dogs or both, but there needs to be an intervention by the law and . . . I'll try to be reasonable and be proportional with the sentence . . . ." J.A. 892—were uttered some seventy-one pages into the transcript of the sentencing hearings. These remarks occurred after the presentation of perturbing testimony, photos, videos, and physical evidence. Viewed thusly, the sentencing judge's remarks are properly characterized as expressions of impatience, dissatisfaction, annoyance, or anger at Defendants and their involvement in dogfighting. *Cf. Liteky*, 510 U.S. at 550–51 ("The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice . . . .").

What is more, the entirety of the sentencing judge's conduct undermines Defendants' argument. Throughout the hearings, the judge not only stated that he would consider each Defendant's case on its own merits but also stated that he had tried to "make each sentence fit the particular characteristics of the crime and the defendant's background and criminal history." J.A. 1142. And he granted Defendants' requests to recommend they be placed in certain prisons or drug-rehabilitation programs. Further still, the judge denied the government's motion to upwardly vary Andrews's sentence "for the purposes of proportionality" and "consisten[cy]" with his co-Defendants' sentences. J.A. 1114. Taken

13

as a whole, the judge's conduct does not evince a deep-seated antagonism that would make fair judgment impossible.

In support of their recusal argument, Defendants chiefly rely on *Berger v. United States*, 255 U.S. 22 (1921), and *United States v. Lefsih*, 867 F.3d 459 (4th Cir. 2017). Yet those cases cannot bear the weight Defendants wish to place on them. In *Berger*, a World War I espionage case involving German-American defendants, the Supreme Court concluded that a district judge was impermissibly biased when he stated: "One must have a very judicial mind, indeed, not to be prejudiced against the German Americans in this country. Their hearts are reeking with disloyalty." 255 U.S. at 28. But that is not all he said. Immediately thereafter, he stated: "This defendant is the kind of a man that spreads this kind of propaganda, and it has been spread until it has affected practically all the Germans in this country." *Id.* at 28–29. He also said: "If anybody has said anything worse about the Germans than I have I would like to know it so I can use it," *id.* at 28, and "I know a safe-blower, he is a friend of mine, who is making a good soldier in France. He was a bank robber for nine years . . . and as between him and this defendant, I prefer the safeblower," *id.* at 29. And he said all of this *before* trial began. *Id.* at 27. The timing, vitriol, and directness of the district court judge's statements in *Berger* significantly differ from the sentencing judge's remarks here.

Nor does *Lefsih* succor Defendants' argument. There, the district court judge's "sustained, one-sided, and in the context of this short and uncomplicated trial, wholly gratuitous" questions and comments in an immigration-fraud case were plain error requiring reversal. 867 F.3d at 469. Critically, the judge in *Lefsih* uttered those remarks

14

before a jury; there, he not only critiqued the federal program at issue but also impugned that defendant's credibility before he even took the stand. *Id.* at 469–70. Here, no jury heard the challenged remarks, so *Lefsih* is therefore inapposite.

"Litigation is often a contentious business, and tempers often flare." *Belue*, 640 F.3d at 575. This observation may be true here—a matter involving photos of emaciated dogs with oozing wounds, videos of dogs so aggressive that they cause themselves to bleed while biting stuffed dogs, and testimony describing how scores of dogs were euthanized because they could not be rehomed safely. But this "is not to say judicial distemper is somehow admirable. It is not." *Id.* at 574. Judges are oathbound to deliver justice in every case before them. Recusal doctrine recognizes that "trial judges make some of the most difficult calls on some of the most volatile matters in our system." *Id.* at 576. Our analysis here does nothing other than recognize that fact.

III.

Our conclusion that Defendants' recusal argument lacks merit does not end this matter, however, for Defendants also argue that their sentences were unreasonable.

"We review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017) (internal quotation marks omitted) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). Our inquiry is twofold: first, we review for procedural reasonableness; then, we review for substantive reasonableness. *Id.*

15

Procedural reasonableness concerns the process used to impose a sentence. For a sentence to be procedurally reasonable, a district court must first correctly calculate the applicable Guidelines range. *Id.* Then, it must allow the parties to argue for "whatever sentence they deem appropriate and consider those arguments in light of all the factors stated in 18 U.S.C. § 3553(a)." *Id.* at 517–18 (internal quotation marks omitted) (quoting *United States v. Hernandez*, 603 F.3d 267, 270 (4th Cir. 2010)). After that, it must individually assess each defendant's facts and arguments and impose an appropriate sentence. *Id.* at 518. Lastly, a district court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* (internal quotation marks omitted) (quoting *Gall*, 552 U.S. at 50).

Substantive reasonableness, by contrast, concerns a sentence's length in light of the statutory sentencing scheme. For a sentence to be substantively reasonable, we examine "the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Gomez-Jimenez*, 750 F.3d 370, 383 (4th Cir. 2014) (quoting *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010)). We "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify" the sentence, *Gall*, 552 U.S. at 51, and the fact that we would have reached a different sentencing result, without more, is insufficient to reverse the district court, *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007).

Though Defendants raise several arguments unique to each, one common argument made is that Defendants' sentences are procedurally unreasonable because the district court

16

did not individually assess each Defendant's facts and arguments. In support of this argument, Defendants essentially make two claims.

First, Defendants argue that, in sentencing them, the district court's reasoning was "generic." Put differently, Defendants argue that the reasons that the district court gave in sentencing them were reasons that any court could give in sentencing any dogfighter. In support, they point to the similar language in each written order as well as *United States v. Miller*, 601 F.3d 734, 739 (7th Cir. 2010), in which the Seventh Circuit stated that an above-Guidelines sentence is more likely to be reasonable if it is based on the particulars of the case rather than "factors common to offenders with like crimes." This is wide of the mark. For one, the scale and extent of Defendants' involvement in dogfighting is unlike an average offender with a like crime—someone who had just, for instance, participated in a dogfight once. Defendants were extensively involved in dogfighting, with some breeding, raising, and training dogs for years. What is more, the district court stressed its obligation "to reach a sentence that's proportional and relevant to each particular defendant in this multi-defendant case," J.A. 924, evincing its individual consideration of each Defendant. And, perhaps most commonsensically, Defendants' sentences stem from a single dogfighting investigation. So each order's similar language strikes us less as generic reasoning and more as a consequence of a matter involving a common set of facts.

Second, Defendants argue that the district court failed to address their nonfrivolous arguments for reduced sentences, citing *United States v. Blue*, 877 F.3d 513 (4th Cir. 2017). Here, the sentencing judge's engagement with the parties and their arguments during the sentencing hearings and in the written orders convince us that this standard is satisfied. As

17

to the remaining procedural and substantive reasonableness challenges that Defendants bring, we have thoroughly reviewed the record and considered Defendants' contentions, and we are satisfied that each sentence imposed is procedurally and substantively reasonable.

IV.

For the foregoing reasons, the judgment of the district court as to each Defendant is

*AFFIRMED*.

18